UNITED STATES of America,
Plaintiff–Appellee,

v.

Geoffrey P. BENSON, Susan L. Benson, and Geoffrey J. O'Connor,
Defendants–Appellants.

Nos. 01–3941, 01–3943 and 01–3944.

United States Court of Appeals,
Sixth Circuit.

Oct. 28, 2003.

Linda M. Betzer, Asst. U.S. Attorney, U.S. Attorney's Office, Cleveland, OH, Glen Garrett McGorty, U.S. Department of Justice, Criminal Division, Fraud Section, Washington, DC, for Plaintiff–Appellee.

Richard L. Scheff, Jill M. Baisinger, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Dennis G. Terez, Cleveland, OH, Richard J. Perez, Davies, Rosplock, Coulson, Perez & Deeb, Willoughby, OH, for Defendants–Appellants.

Before: NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

## OPINION

ALAN E. NORRIS, Circuit Judge.

Defendants appeal their mail fraud and tax fraud convictions, as well as their sentences. For the reasons given below, the criminal convictions are affirmed. We remand to the district court for resentencing in accordance with this opinion.

## I.

Mr. and Mrs. Benson founded The Infinity Group Company ("TIGC") as a family trust in November 1995. Soon thereafter, they embarked upon a pyramid scheme called "Gasoline Goes MLM." "MLM" stood for "multilevel marketing." Mr. Benson sold membership in the program for $160. Members were given "membership kits" that held postcards and mailing addresses for recruiting others. Members were promised a 3 cent per gallon rebate on gasoline purchases. They also received points for buying marketing materials and recruiting. A member who accumulated enough points was promised free gasoline for life. "Gasoline Goes MLM" sold nothing except memberships and had no contracts with gasoline suppliers. It was discontinued in January 1997.

While running the gasoline scheme, Mr. Benson mailed copies of his newsletter, *Financial Resources,* to club members. The newsletter provided details on the gasoline scheme and Mr. Benson's opinions on the unconstitutionality of the income tax. In the June 1996 newsletter, he presented a new investment plan called the "Asset Enhancement Program."

The Asset Enhancement Program sold shares in TIGC for $100 apiece. Although Mr. Benson was careful to call the shares "units" and the purchases of the units "property transfers," the program actually involved the sale of securities. It is clear that the Asset Enhancement Program was a Ponzi scheme.

Mr. Benson initially stated that funds would be invested in unidentified "European Prime Banks." Later explanations of the investment plan were equally obscure. Mr. Benson did not guarantee the investment principal. He did guarantee a rate of return of between 138% and 181%. He also suggested that the investment carried no risk at all.

Between June 1996 and August 1997, 4,400 people invested approximately $26 million in the Asset Enhancement Program. Mr. Benson hired Mrs. Benson to handle this influx of cash and deal with the public. O'Connor was hired earlier to handle marketing and sales. O'Connor deposited $25,000 in the Asset Enhancement Program.

Mr. and Mrs. Benson created a string of different trusts, some of which were controlled by Mrs. Benson and the Bensons' daughter, Jennifer Bordelon. A court-appointed receiver, Robert F. Sanville, later determined that the trusts were funded exclusively by money from the Asset Enhancement Program. Defendants used the funds to finance their personal expenses, which included cars, the Bensons' luxury home, and normal household expenses.

Defendants do not identify any investments made on behalf of program investors as profitable, but they maintain that they believed that all the investments were legitimate. Investments included a loan to family members to finance a professional bowler's career and the $302,000 purchase of a worthless antique railroad bond.

Regulatory authorities became suspicious of TIGC. A number of states issued letters of inquiry and cease and desist orders based on TIGC's sale of unregistered securities. National City Bank, used by TIGC for deposits, also became suspicious after observing the deposit of a large number of small checks followed by large

transfers to overseas accounts. In April 1997, as TIGC remained unresponsive to its inquiries, National City closed TIGC's accounts. TIGC maintained other bank accounts, however, including two in the Caribbean island of St. Kitts.

In January 1997, postal inspectors and Securities and Exchange Commission ("SEC") officials visited TIGC's trailer home headquarters in Fairport Harbor, Ohio. Mr. Benson refused to talk with them. In May 1997, he failed to comply with a SEC subpoena for books and records.

In March 1997, Ohio's Department of Commerce, Division of Securities discovered a website advertising the Asset Enhancement Program. Eventually, the Securities Division obtained a restraining order forbidding TIGC to sell unregistered securities. When this order was ignored, the Division obtained a search warrant for TIGC headquarters.

When the headquarters were searched, Mrs. Benson hid a computer disk on her person. O'Connor later asked Ron Satyshur, the caretaker of the estate, to hide the disk in a barn. TIGC kept virtually no business records.

While the investigations proceeded and continuing after his indictment, Mr. Benson brought a number of civil suits against prosecutors, investigators, and state and federal judges, including the district court judge. He even filed two apparently frivolous lawsuits against his own public defender.

Defendants were indicted for conspiracy to commit mail fraud and mail fraud in violation of 18 U.S.C. §§ 371, 1341, wire fraud in violation of 18 U.S.C. § 1343, conspiracy to impede and impair the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 371, 26 U.S.C. § 7201, and tax evasion in violation of 26 U.S.C. § 7201. The district court's opinion denying defendants' motion for a judgment of acquittal noted that their only defense at trial was good faith.

Defendants were convicted on all counts. Mr. Benson was convicted of thirteen felony counts, Mrs. Benson of six, and O'Connor of seven. Mr. Benson was sentenced to 360 months of incarceration, and Mrs. Benson and O'Connor each received 121 months. This appeal followed.

## II.

### 1. Sufficiency of the Evidence

This court reviews challenges to convictions based on insufficient evidence deferentially, viewing the evidence in the light most favorable to the government. *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992) (en banc).

■ Mrs. Benson argues that insufficient evidence showed that she committed mail fraud. Specifically, she claims that little evidence indicated that she knew about the investments or related matters. To convict her of mail fraud, the government must establish that she used the mails with a specific intent to deceive or defraud. *United States v. Brown*, 147 F.3d 477, 483 (6th Cir.1998).

Viewing the evidence in the light most favorable to the government, evidence existed of Mrs. Benson's intent. She was listed as TIGC's executive secretary, she served as trustee on some of the trusts used in furtherance of the scheme, her name was on overseas bank accounts, and a letter from a state agency regarding the sales of unregistered securities was addressed directly to her. The jury could infer from Mrs. Benson's 30–year marriage to Mr. Benson that she knew the falsity of his claims of being an international banker. Accordingly, sufficient evidence existed from which the jury could find that Mrs. Benson had a specific intent to deceive or defraud.

■ O'Connor claims that insufficient evidence existed to support his conviction for mail fraud. Though he claims that he was merely a salesman for Mr. Benson, the evidence indicates that his job included dealing with investors' concerns. He knew about the cease and desist orders from various states, but continued to carry out the scheme. Viewing the evidence in the light most favorable to the government, sufficient evidence existed for the jury to conclude that O'Connor had a specific intent to deceive or defraud.

■ Finally, Mrs. Benson claims that there was insufficient evidence to support her conviction for tax evasion under 26 U.S.C. § 7201. To prove a violation, the government must establish the existence of a tax deficiency, willfulness, and an affirmative act constituting evasion. *United States v. Middleton*, 246 F.3d 825, 842 (6th Cir.2001). An accounting demonstrated that Mrs. Benson owed nearly $300,000 in taxes for TIGC income. Mrs. Benson argues that she never actively concealed her failure to pay taxes, and so did not commit an "affirmative act." However, Mrs. Benson was involved in the creation and maintenance of trusts that hid her income. In addition, she kept virtually no records of TIGC's finances though she was charged with handling the millions of dollars from the scheme. The avoidance of record-keeping is an affirmative act for the purposes of 26 U.S.C. § 7201. *Id.* at 843. Viewing this evidence in the light most favorable to the government, sufficient evidence existed for the jury to conclude that Mrs. Benson engaged in an affirmative act.

### 2. The Suppression Ruling

■ Defendants contend that the district court erred in denying their motion to suppress evidence obtained from the Securities Division's search of TIGC headquarters. They claim that the warrant was based upon a "bare bones" affidavit and not supported by probable cause. A supporting affidavit is "bare bones" if it merely states an official's beliefs or suspicions. *United States v. Williams*, 224 F.3d 530, 533 (6th Cir.2000). We review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Leake*, 998 F.2d 1359, 1362–63 (6th Cir. 1993).

The affidavit supporting the Securities Division's request for a search warrant stated that 80 people had purchased "units" in TIGC, that each "unit" constituted a security under Ohio law, that a search of state records revealed that Mr. Benson was not a licensed securities dealer and was not exempt from the licensing requirement, and that large amounts of investors' funds had been wired into overseas bank accounts. The affidavit was more than "bare bones."

### 3. Admission of Cease and Desist Orders

■ Defendants assert that the district court erred in admitting into evidence cease and desist orders from different state agencies, as well as related correspondence, for the purpose of negating defendants' good faith defense by demonstrating defendants' knowledge and intent to defraud. The court allowed the documents as evidence of other crimes or bad acts under Fed.R.Evid. 404(b). The court also issued a limiting instruction to the jury which it repeated from this circuit's Pattern Criminal Jury Instructions, Instruction 7.13. We review the admission of evidence under the following three-step analysis:

First, we review for clear error the district court's factual determination that sufficient evidence exists that the other acts occurred. Second, we review *de novo* whether the district court correctly determined that the evidence was admissible for a legitimate purpose. Third,

we review for abuse of discretion the district court's determination that the "other acts" evidence is more probative than prejudicial under Rule 403.

*United States v. Comer,* 93 F.3d 1271, 1277 (6th Cir.1996) (citations omitted).

Defendants assert that the district court failed to ascertain whether the acts took place. However, defendants never disputed that they were engaged in the sale of TIGC "units." Defendants also argue that the cease and desist orders did not accuse them of the crimes for which they were indicted. However, it is clear that these were "other acts," and were properly admitted not as evidence of defendants' guilt, but as evidence of their knowledge and intent to defraud.

Defendants also challenge the district court's limiting instructions as insufficient because the jury was not told that cease and desist orders can issue without proof beyond a reasonable doubt. Because the jury was instructed to consider the cease and desist orders only for the purpose of demonstrating the defendants' knowledge and intent, the orders need not have issued only upon a finding of proof beyond a reasonable doubt.

Finally, defendants argue that the prejudice of admitting the orders outweighed their probative value. This court has examined the potential prejudice in admitting cease and desist orders. *United States v. Gold Unlimited, Inc.,* 177 F.3d 472, 486–87 (6th Cir.1999). In that case, we ruled that the district court's admission of cease and desist orders for the purpose of showing knowledge was not in error. *Id.* Here, where the district court admitted the orders to show defendants' knowledge as well as their intent, there was likewise no error.

### 4. Exclusion of the IRS Letter

■ We review for abuse of discretion the district court's exclusion of an opinion letter from the IRS. The letter stated that a pure trust did not require a taxpayer identification number because it bore no tax liability. Defendants wished to introduce the letter to support their good faith defense.

The letter was not unassailable. It was addressed to an individual other than defendants and neither the IRS nor an expert for defendants authenticated it. The court-appointed trustee testified that he believed the letter was doctored because it named the addressee but no address. Because defendants failed to defend their exhibit, the district court did not abuse its discretion.

### 5. Video Conference Testimony

■ The district court permitted 85-year-old Zelda Greger to testify via video conference from California because she was too ill to travel. All parties could see and hear her, and defense counsel cross-examined her. In reviewing the district court's decision to allow video conference testimony, the factual determinations that supported the decision are reviewed for clear error, while the legal conclusions are reviewed *de novo. United States v. Weekley,* 130 F.3d 747, 750 (6th Cir.1997).

Defendants argue that the video conference testimony violated their rights under the Confrontation Clause of the Sixth Amendment, that the appearance of an elderly and infirm witness inflamed the jury, that Greger was an unnecessary, cumulative witness, and that insufficient evidence existed to support the conclusion that she was too ill to travel. The Supreme Court, holding that the right to confrontation is not absolute, has detailed a number of important reasons for that right, including: 1) the giving of testimony under oath; 2) the opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and

4) the reduced risk that a witness will wrongfully implicate an innocent defendant. *Maryland v. Craig,* 497 U.S. 836, 845–46, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Second Circuit has applied these reasons to a two-way video conference:

> The closed-circuit television procedure utilized for [the witness's] testimony preserved all of these characteristics of in-court testimony: [the witness] was sworn; he was subject to full cross-examination; he testified in full view of the jury, court, and defense counsel; and [the witness] gave this testimony under the eye of [defendant] himself. [Defendant] forfeited none of the constitutional protections of confrontation.

*United States v. Gigante,* 166 F.3d 75, 80 (2d Cir.1999) (footnote omitted). The same reasoning applies in this case.

■ Defendants' argument that the appearance by video conference of an elderly, infirm witness would inflame the jury has little force. Had Greger testified in person, her appearance would have had more potential to inflame. Defendants' claim that Greger was a cumulative witness also falls short. Unlike other witnesses, Greger dealt solely with O'Connor and only she could testify regarding specific contacts with him. Finally, defendants' contention that insufficient evidence demonstrated that Greger was too ill to travel also fails. Greger testified that she and her husband had extensive health problems, that she was underweight and fatigued due to major stomach surgery the previous year, and that she was still under the care of a gastrologist. The district court did not commit clear error in finding that Greger was too ill to travel.

### 6. *Admission of Co–Conspirator Statements*

■ Federal Rule of Evidence 801(d)(2)(E) provides that statements made by co-conspirators "during the course and in furtherance of the conspiracy" are not hearsay. The Supreme Court has held that prior to the admission of any evidence under the Rule, "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The district court admitted statements by each defendant to be considered for their truth against all three defendants. The court admitted the statements without making individualized rulings regarding the admissibility of each one. Instead, the judge stated that, because the clearly admissible evidence of a conspiracy was so strong, all of the challenged statements would be admitted under the Rule. We review the district court's factual findings for clear error and its legal conclusions *de novo. United States v. Maliszewski,* 161 F.3d 992, 1007 (6th Cir.1998).

Mrs. Benson and O'Connor argue that the district court had insufficient evidence to conclude that a conspiracy existed, that some of the admitted statements related to acts occurring prior to the time that Mrs. Benson joined the conspiracy, and that the court's ruling was too broad in permitting the general admission of all the challenged statements.

There are no grounds to claim that the district court committed clear error in finding that sufficient evidence existed to demonstrate that Mrs. Benson and O'Connor conspired together. Both participated with Mr. Benson in closed-door meetings, O'Connor dealt with investors, Mrs. Benson performed bookkeeping work, the working quarters were tight, Mrs. Benson knew her husband was not an international banker and had sufficient business experi-

822

ence to know that TIGC was not legitimate, both knew about the large amounts of money being sent by investors, and both knew of at least one state investigation.

■ Mrs. Benson's contention that some of the admitted statements related to events transpiring before she entered the conspiracy is irrelevant. A co-conspirator can generally be held liable for "actions done in furtherance of a conspiracy before [the particular co-conspirator] joined." *United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir.1983).

Finally, defendants are unable to support their argument that the district judge's ruling admitting the statements was not specific enough. They fail to identify any specific statement that would not be admissible under Rule 801(d)(2)(E). Nor do they cite cases indicating that a district court must individually admit challenged pieces of evidence. Because there is no reason to doubt the district judge's familiarity with the challenged statements, there are no grounds to question the applicability of Rule 801(d)(2)(E).

### 7. Prosecutorial Misconduct

Defendants raise several objections to statements made by prosecutors at trial. This court analyzes allegations of prosecutorial misconduct as follows:

First, the court is to apply the so-called *Leon* factors to determine whether the impropriety was flagrant. Flagrant improprieties constitute reversible error. Non-flagrant improprieties are subjected to the *Bess* test which requires a new trial if guilt was not overwhelming, defendant objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury.

The *Leon* factors are as follows:

(1) The degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused;

(2) whether the comments were isolated or excessive;

(3) whether they were deliberately or accidentally placed before the jury;

(4) and finally, the strength of the competent proofs introduced to establish the guilt of the accused.

*United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir.1995) (citations omitted). We review prosecutorial conduct *de novo*. *United States v. Emuegbunam*, 268 F.3d 377, 403–04 (6th Cir.2001).

■ All defendants object to the prosecution's discussion in closing argument of the anti-tax and anti-government political statements in Mr. Benson's newsletters as prejudicial and irrelevant. Not only did they fail to raise this objection at trial, discussion of these statements was proper because they cast doubt on defendants' good faith defense.

■ Defendants also object to a prosecutor's remark, made in reference to Mr. Benson's published comments on the SEC investigation: "They are talking about [the] Philadelphia [civil proceedings] here, and then the terrible judge out there wouldn't listen to any of their constitutional or law issues. Denied them their due process rights, as federal judges do on a regular basis, I suppose." Defendants objected, the statement was stricken, and a curative instruction followed. Even if the sarcasm was objectionable, it did not constitute flagrant misconduct.

Defendants further object that a prosecutor's statement that money deposited with TIGC went to Mr. Benson's "buddies" was unsupported by evidence. Upon objection, the court gave a curative instruction, but the prosecutor pointed to trustee Sanville's report as support for the statement. No objection or curative instruction followed. The government now points to a newsletter in which Mr. Benson described

his business relations as "wonderful people" who changed his "way of life forever." A business partner of Mr. Benson who received TIGC funds placed fake mortgages on Mr. Benson's property to frustrate trustee Sanville. These individuals could be considered Mr. Benson's "buddies." Therefore, the description of fund recipients as "buddies" of Mr. Benson had some support in evidence and cannot be described as flagrant.

 Mrs. Benson objects to the prosecution's characterization of her role in the scheme as unsupported by the evidence. The prosecution described her role as "bookkeeping" and stated that "[she] seemed to be in charge, and the evidence shows she was in charge, of the checkbooks[; s]he wrote the checks, she kept in the account what the balances were." Defendants failed to object at trial. The only testimony regarding Mrs. Benson's job description stated that "she kind of helped Donna Smeker as far as mailing and getting things in order." Based on this testimony, it would appear that the prosecution overstated its case, but the overstatement did not amount to flagrant abuse or plain error. Mrs. Benson was heavily involved in the day-to-day functioning of TIGC, writing checks on trust accounts and serving as a named trustee and executive secretary.

O'Connor objects that the prosecution incorrectly stated that he had never invested in TIGC, though the record demonstrates that he deposited $25,000 with the trust. However, the prosecutor's statement came in the context of explaining that O'Connor's investment meant very little given his free access to trust funds: "That's no better than taking money out of one pocket that's not your own in the first place and putting it in the other." Following an objection, the district court gave a cautionary instruction. Given the statement's context, no flagrant abuse occurred.

Finally, O'Connor objects to the government's suggestion that the disk O'Connor had hidden in a barn "perhaps" contained "a list of the members." No record of the contents of the disk existed. However, the prosecutor merely suggested the contents of the disk and O'Connor failed to timely object at trial. Furthermore, the other evidence of guilt was overwhelming.

*8. Ponzi and Pyramid Scheme Instructions*

 Defendants object to the district court's jury instructions regarding the operation of Ponzi and pyramid schemes. We review jury instructions for abuse of discretion, and the district court's discretion has been described as "broad." *United States v. Prince,* 214 F.3d 740, 760–61 (6th Cir.2000). Furthermore, we review them as a whole to determine whether they fairly and adequately inform the jury of the applicable law. *Id.* at 760.

The district court's instructions were lifted almost verbatim from the language of this court's opinion in *Gold Unlimited:*

MLM [multilevel marketing] programs survive by making money off product sales, not new recruits. In contrast, "pyramid schemes" reward participants for inducing other people to join the program; over time, the hierarchy of participants resembles a pyramid as newer, larger layers of participants join the established structure. Ponzi schemes operate strictly by paying earlier investors with money tendered by later investors. No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, regulators evaluate the marketing strategy (*e.g.,* emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted.

*Gold Unlimited,* 177 F.3d at 475. Defendants object that the jury was not instructed on the definition of a legitimate multilevel marketing program. This court stated that it would be "prudent" to provide the jury with such an instruction in *Gold Unlimited. Id.* at 483. In that case, some evidence existed that the defendants purchased gold for their clients. In this case, there was no evidence of any good or service being provided by defendants.

Defendants object that the instructions should have taken into account their investments with outside investment companies. However, little evidence exists to indicate that defendants ever made legitimate investments of trust funds. Even if such investments existed, they would not negate the existence of a fraudulent investment scheme; the question is whether those funds would ever be returned to the investors in appropriate amounts. Defendants failed to place in evidence any indication that they were operating like a legitimate multilevel marketing program. Therefore, the district court did not abuse its discretion in its Ponzi or pyramid scheme instructions.

### 9. *Failure to Instruct on Lesser Included Offense*

■ Defendants object that the district court failed to instruct the jury on the lesser included offense of willful failure to pay a tax under 26 U.S.C. § 7203.

Defendants were convicted of violating 26 U.S.C. § 7201, which includes three elements: 1) the existence of a tax deficiency; 2) willfulness; and 3) an affirmative act of evasion or attempt at evasion. *United States v. Daniel,* 956 F.2d 540, 542 (6th Cir.1992). The government states that a section 7203 offense has three elements: 1) an obligation to file a tax return; 2) failure to file a tax return by the due date; and 3) willfulness. *See United States v. Foster,* 789 F.2d 457, 460 (7th Cir.1986).[1] Defendants take issue with the government's parsing of section 7203 into elements, claiming that section 7203 simply lacks the overt act element of section 7201.

Federal Rule of Criminal Procedure 31(c) provides that a defendant may be found guilty of an offense necessarily included in the offense charged. The Supreme Court has instructed courts to apply the following analysis under the Rule:

---

1. The relevant sections read in full as follows:

§ 7201. *Attempt to evade or defeat tax*

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

§ 7203. *Willful failure to file return, supply information, or pay tax*

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 60501, the first sentence of this section shall be applied by substituting "felony" for "misdemeanor" and "5 years" for "1 year".

Under [the elements] test, one offense is not "necessarily included" in another unless the elements of the lesser are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c).

*Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In *Schmuck,* the Supreme Court recognized that this analysis had been applied in earlier decisions, one of which involved sections 7201 and 7203. *Id.* at 720 n. 11. In that decision, *Sansone v. United States,* 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), the Court had used the "elements" analysis under Rule 31(c) and determined that a defendant charged with a section 7201 violation may be entitled to a section 7203 lesser included offense charge if more than the "willfulness" element was at issue. *Sansone,* 380 U.S. at 351–52. However, if only "willfulness" was challenged, a defendant would not be entitled to a section 7203 charge:

> The only issue at trial was whether petitioner's act was willful. Given this affirmative commission and the conceded tax deficiency, if petitioner's act was willful, that is, if the jury believed, as it obviously did, that he knew that the capital gain on the sale of the property was reportable in 1957, he was guilty of violating both §§ 7201 and 7203. If his act was not willful, he was not guilty of violating either § 7201 or § 7203. Thus on the facts of the case, §§ 7201 and 7203 covered precisely the same ground . . . .[and] petitioner was not entitled to a lesser-included offense charge based on § 7203.

*Id.* at 352 (quotation omitted). Regardless who is correct in parsing sections 7201 and 7203, defendants were not entitled to a lesser included offense charge because they mounted only a good faith defense,

failing to challenge anything beyond the "willfulness" element.

### 10. *"Deliberate Ignorance" Instructions*

██ The district court charged the jury on "deliberate ignorance" in accordance with this circuit's practice. O'Connor argues that insufficient evidence existed to support the charge. Because the facts recited above strongly suggest that O'Connor understood the scheme in significant detail, the district court did not err in finding that sufficient evidence supported giving the instruction.

### 11. *Sixteen–Point Enhancement for Loss in Excess of $20 Million*

In reviewing the district court's sentencing decisions, we review factual findings for "clear error" and conclusions of law *de novo. United States v. Hamilton,* 263 F.3d 645, 651 (6th Cir.2001). While mixed questions of law and fact are generally reviewed *de novo,* the Supreme Court has indicated that the application of the Guidelines to undisputed facts may call for a more deferential standard of review. *Buford v. United States,* 532 U.S. 59, 64, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001).

██ Defendants contend that the pre-sentence report erroneously calculated the loss they caused at over $26 million, with roughly $2.7 million returned through "downline" payments, interest payments, or refunds. They claim that the proper loss figure is $12 million, the amount that the pre-sentence report identified as the net loss to victims after accounting for monies recovered. The factual issues involving the calculation of loss are reviewed for clear error, *United States v. Brown,* 151 F.3d 476, 489 (6th Cir.1998), while the meaning of the loss is reviewed *de novo. United States v. Lucas,* 99 F.3d 1290, 1293 (6th Cir.1996).

Loss to victims in a Ponzi scheme is not to be reduced by amounts recovered by a bankruptcy trustee. *United States v. Wolfe,* 71 F.3d 611, 618–19 (6th Cir.1995). However, if part of the investment is protected by collateral, a reduction may be appropriate. *Id.* at 619 (discussing U.S.S.G. § 2F1.1 comment). Defendants argue that the loss should be reduced by $800,000 in real estate purchases. However, because these assets were not pledged as collateral, and investors had no lien on them, the loss should not have been reduced.

Defendants also argue that the loss should be adjusted to reflect the nearly $12 million unsuccessfully invested in various ventures, citing trustee Sanville's testimony. Sanville testified, however, that none of the investments were legitimate, and defendants do not contest that the investments were not those advertised in the newsletters. Thus, they should be included in the fraud.

Mrs. Benson and O'Connor argue that they were improperly assigned the entire loss amount instead of the share for which each owed taxes. However, the joint criminality provisions of the Guidelines state that a defendant is responsible for all reasonably foreseeable co-conspirator conduct. The court was permitted to assign each defendant the entire loss amount if it was reasonably foreseeable.

▮▮▮▮ Mrs. Benson argues that no evidence existed to demonstrate that she knew of the investments or was aware of their chances of success. Thus, she argues, she could not have reasonably foreseen the loss. However, Mrs. Benson was executive secretary of the organization. She signed trust documents and helped set up trusts to conceal where the money went. She had business experience from her previous work as a buyer for a department store, and she handled the accounting, bookkeeping and banking functions of

TIGC. Ample evidence shows that she understood the scope of the scheme. Mrs. Benson also argues that she should not have been assigned some $500,000 in loss that came to TIGC prior to her employment in 1996. However, as discussed above, a co-conspirator is generally liable for bad acts conducted prior to her joining the conspiracy. The district court did not err in its loss calculation.

### 12. Two–Point Enhancement for Violating a "Prior, Specific Judicial or Administrative Order"

Mrs. Benson and O'Connor argue that cease and desist orders are not to be considered in determining whether they violated a "prior, specific judicial or administrative order." They rely on a case from the Ninth Circuit, *United States v. Linville,* 10 F.3d 630 (9th Cir.1993), which held that it was improper to apply this enhancement when the defendant ignored a Department of Agriculture letter asking that he stop his unlicensed sale animals for research. *Id.* at 631. However, the letters in *Linville* were not administrative orders, whereas the cease and desist orders in this case were.

Mrs. Benson and O'Connor also argue that insufficient evidence existed for the district court to apply the enhancement to them because they lacked notice of the cease and desist orders. However, O'Connor signed a return receipt for one of the cease and desist orders. A memo between Mr. Benson and O'Connor suggested placing an anonymous telephone call to New Hampshire authorities to inquire about an order. Mrs. Benson received letters personally addressed to her by registered mail stating that Missouri's issuance of an order was imminent. In addition, she worked closely with O'Connor and Mr. Benson throughout the conspiracy. Sufficient evidence showed that Mrs. Benson and O'Connor knew about the orders.

Mr. Benson contends that insufficient evidence showed that he violated the cease and desist orders. However, the orders required him to cease marketing. By continuing to send mailings, he violated the orders. The district court did not err in applying the enhancement to each defendant.

### 13. Two–Point Enhancement for Obstruction of Justice

Mr. Benson challenges the district court's imposition of a two-point enhancement for obstruction of justice. The district court based its determination on Mr. Benson's filing of multiple lawsuits against investigators, prosecutors, and judges, and Mr. Benson's maintenance of fraudulent mortgages to protect his property. Mrs. Benson and O'Connor challenge the court's application of the enhancement for hiding the computer disk. We review an enhancement for obstruction of justice for clear error. *United States v. Jackson–Randolph*, 282 F.3d 369, 389–90 (6th Cir. 2002).

▪ Mr. Benson argues that the district court, in applying the enhancement, should not have considered his actions prior to the initiation of the criminal investigation, and further argues that the court erred by holding his lawsuits against him and punishing him for exercising his constitutional rights to petition the government and request a jury trial. Mr. Benson is correct to contend that actions pre-dating the initiation of the criminal investigation do not count towards the enhancement. *United States v. Brown*, 237 F.3d 625, 628 (6th Cir.2001). Regardless of the merits of Mr. Benson's constitutional argument, however, it does not address the entirety of the district court's reasoning. In addition to relying on the lawsuits, the court found that Mr. Benson created fake mortgages on his real estate purchases that interfered with the trustee's attempts to restore money to fraud victims. Mr. Benson's filing of fake mortgages after the criminal investigation against him had begun provided the court with sufficient basis for apply the enhancement.

Mrs. Benson and O'Connor attack their obstruction of justice enhancements on two grounds: 1) insufficient evidence existed to conclude that the disk contained a membership list and that Mrs. Benson removed it from the office; and 2) the government had already obtained the membership list; therefore, hiding a disk containing them could not constitute obstruction.

▪ Sufficient evidence exists to conclude that the disk contained the list and that Mrs. Benson hid it. A witness testified that she went with Mrs. Benson and O'Connor after they exited TIGC headquarters and saw Mrs. Benson remove the disk from her waistband. This witness said that she knew Mrs. Benson had been working on the list just before the search. She also testified that TIGC was using the list on new computers the next day. The caretaker of the estate, Ron Satyshur, testified that O'Connor asked him to hide the disk in a barn on the day of the search. The district court did not commit clear error in concluding that Mrs. Benson and O'Connor hid the disk, and that it contained the mailing list.

Hiding the disk constituted obstruction of justice even if the government had already obtained copies of the mailing list. The enhancement was imposed under Section 3C1.1 of the Sentencing Guidelines, which reads as follows:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (1997). Although the investigation into the conspiracy may not

have been impeded by the concealment of the disk, the "administration of justice" was. Mrs. Benson and O'Connor frustrated a purpose of the search: to prevent the further sale of unregistered securities.

Mrs. Benson argues that the enhancement should not apply because the Securities Division's investigation was not pursued for the purpose of charging the defendants with the "instant offense." The investigation was pursued for the purpose of charging the defendants with the sale of unregistered securities. The 1997 Guidelines define "offense" as "the offense of conviction and all relevant conduct." U.S.S.G. § 1B1.1 comment (n.1) (1997). "Instant" is used in connection with "offense" to "distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense, or from an offense before another court." *Id.* The sale of unregistered securities was clearly relevant to the fraud with which defendants were charged, and therefore constitutes part of the "instant offense." Further, this court has held that an enhancement may result from obstruction of a related state investigation. *United States v. Smart,* 41 F.3d 263, 266 (6th Cir.1994). The district court did not err in applying the obstruction of justice enhancement to each defendant.

### 14. Failure to Decrease Offense Level for Mitigating Roles

▮ Mrs. Benson and O'Connor contend that the district court erred in failing to grant them downward adjustments for "minimal" or "minor" roles in the offense. U.S.S.G. § 3B1.2. We review a district court's denial of a mitigating role adjustment for clear error. *United States v. Miller,* 56 F.3d 719, 720 (6th Cir.1995). The district court denied the adjustments on the grounds that Mrs. Benson and O'Connor were responsible for disseminating newsletters. Mrs. Benson maintained the mailing list, knew the content of the newsletters, and had bookkeeping responsibilities, while O'Connor was marketing director, recruiting new members and quelling current investors' concerns. Both hid the disk. The district court is well-supported in its denial of mitigating role adjustments.

### 15. Four–Point Enhancement for Crimes Affecting a Financial Institution

▮ Mr. Benson argues that the district court erred in applying a four-point enhancement for crimes affecting a financial institution. The district court held that Mr. Benson's fraud had affected the Bank of America because it was sued by trustee Sanville in an unsuccessful attempt to recover investors' money. We review a sentencing enhancement for "affecting a financial institution" with "due deference" to the district court. *United States v. Wiant,* 314 F.3d 826, 831 (6th Cir.2003).

The relevant 1997 Guideline reads as follows:

(6) If the offense—

(A) substantially jeopardized the safety and soundness of a financial institution; or

(B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense,

increase by 4 levels. If the resulting offense level determined under subdivision (A) or (B) is less than 24, increase to level 24.

U.S.S.G. § 2F1.1(b) (1997). Mr. Benson first argues that he did not "derive more than $1,000,000 in gross receipts from the offense" because the receipts went to his trusts. However, since his trusts were shams that Mr. Benson and controlled, the receipts could be properly attributed to him.

Mr. Benson also argues that he did not "affect" a financial institution. Bank of

America was only "affected" when trustee Sanville undertook a losing lawsuit against it to recover funds that Mr. Benson had deposited. Mr. Benson's sentence should not be enhanced because of the voluntary actions of a non-conspirator. Therefore, we agree that Mr. Benson did not "affect" a financial institution, and the district court erred in applying the enhancement to him.

### 16. Application of November 2000 Sentencing Guidelines

Defendants contend that the district court erred in applying the November 2000 Sentencing Guidelines after holding that the offenses of conviction were concluded by August 1998. Under this circuit's precedent, "the Guidelines in effect at the time of the criminal act must be applied" where later Guidelines change the "legal consequences of the acts completed before [that Guideline's] effective date." *United States v. Kussmaul,* 987 F.2d 345, 351–52 (6th Cir.1993).

Defendants' sentences were enhanced using two sentencing enhancements in the 2000 Guidelines that did not exist in 1997: the enhancement for using mass-marketing and the enhancement for using complicated methods and offshore accounts. We must therefore remand for resentencing under the 1997 Guidelines.

### Conclusion

For the foregoing reasons, we **RE-MAND** for resentencing under the 1997 Guidelines and **REVERSE** the district court's application of a four-point enhancement for "affecting a financial institution." We **AFFIRM** the district court's decision in all other respects.