PEOPLE v BUIE

Docket No. 278732. Submitted January 7, 2009, at Grand Rapids.
Decided August 25, 2009, at 9:10 a.m.

A jury in the Kent Circuit Court, Dennis B. Leiber, J., convicted
James H. Buie of two counts of first-degree criminal sexual
conduct involving a victim under the age of 13, three counts of
first-degree criminal sexual conduct involving the use of a weapon,
and possession of a firearm during the commission of a felony. The
defendant appealed, alleging, in part, that he was deprived of his
constitutional right to confront the witnesses against him when
two nonvictim, prosecution witnesses were allowed to testify by
way of two-way, interactive video technology.

The Court of Appeals *held*:

1. The required elements of the Confrontation Clause of the
Sixth Amendment are physical presence, an oath, cross-
examination, and observation of demeanor by the trier of fact.
However, the right of the accused to meet witnesses face-to-face is
not absolute and the Confrontation Clause simply reflects a
preference for face-to-face confrontation at trial. This preference
must occasionally give way to considerations of public policy and
the necessities of the case. Before a trial court may allow the
taking of a witness's testimony through two-way, interactive video
technology, the trial court must hear evidence and make case-
specific findings that the procedure is necessary to further a public
policy or state interest important enough to outweigh the defen-
dant's constitutional right of confrontation and that it preserves
all the other elements of the Confrontation Clause.

2. The trial court in this case failed to make the case-specific
findings regarding the necessity of the videoconferencing proce-
dure implemented. The case must be remanded to the trial court to
hear evidence and make case-specific findings regarding whether
the procedure was necessary to further a public policy or state
interest important enough to outweigh the defendant's confronta-
tion rights.

3. MCR 6.006(C)(2) permits a trial court to take witness
testimony by two-way, interactive video technology if the defen-
dant is either present in the courtroom or has waived the right to

be present, there is a showing of good cause, and the parties consent. There was no showing of good cause in this case and no showing that the defendant consented to the procedure. In fact, the defendant objected to the procedure. The defendant did not waive his right to confront the two prosecution witnesses.

Remanded for further proceedings consistent with the opinion of the Court of Appeals and its accompanying order.

CONSTITUTIONAL LAW — CONFRONTATION CLAUSE — TRIAL — WITNESSES — TWO-WAY, INTERACTIVE VIDEO TECHNOLOGY.

A trial court, before it may allow the taking of a witness's testimony through two-way, interactive video technology, must hear evidence and make case-specific findings that the procedure is necessary to further a public policy or state interest important enough to outweigh the defendant's constitutional right of confrontation and that it preserves the other elements of the Confrontation Clause that require an oath, cross-examination, and observation of demeanor by the trier of fact.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Timothy K. McMorrow*, Chief Appellate Attorney, for the people.

*State Appellate Defender* (by *Jonathan Sacks*) for the defendant.

Before: BECKERING, P.J., and WHITBECK and M. J. KELLY, JJ.

PER CURIAM. Defendant James H. Buie appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC) involving a victim under the age of 13, MCL 750.520b(1)(a), three counts of first-degree CSC involving the use of a weapon, MCL 750.520b(1)(e), and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment for his CSC convictions and two years' imprisonment for his felony-

firearm conviction. We remand for further proceedings consistent with this opinion.

I

On June 27, 2001, defendant entered a house in Grand Rapids, Michigan, and sexually assaulted BS and minors LS, age 13, and DS, age 9. At the time of the incident, LS and DS lived in the house with their mother, their two brothers, and their mother's roommate. BS, who was a close family friend, was at the house that night to babysit the children while their mother was out. LS and DS's mother testified that she knew that BS had used cocaine in the past, but believed that BS was "clean" when she asked her to watch the children. BS later admitted, however, that she was still using cocaine at the time of the incident.

BS arrived at the house at approximately 7:00 p.m. Between 1:00 and 2:00 a.m., she went and sat down on the front porch. BS initially reported that defendant forced her back inside the house at gunpoint. According to BS's trial testimony, however, defendant approached her while she was seated on the porch. He asked to use a telephone. BS consented and allowed defendant to enter the house. She then propositioned defendant to exchange sexual favors for cocaine and led him into a large closet. Once inside the closet, defendant pointed a gun at BS's head and penetrated her vagina with his penis. He also attempted to penetrate her anally.

During the assault, BS heard the roommate of the minor's mother at the front door. After the roommate entered the house, defendant struck him in the head with a gun. The roommate fell to the floor, unconscious. At that point, LS, DS, and the other two children entered the room. LS and DS testified that they saw defendant

holding a gun to BS's head. Defendant then ordered BS and all four of the children to enter the closet and lie down.

According to LS, defendant subsequently moved her from the closet to the couch. Once on the couch, defendant penetrated her vagina with his penis. During the assault, defendant told LS that he loved her and that if she tried to escape, he would kill her family. Defendant assaulted LS again in her bedroom and in the kitchen. At some point, he attempted to penetrate her anally. After the assault in the kitchen, defendant took LS back to the couch and told her to put her head down. Defendant then moved DS from the closet to the kitchen. According to DS, defendant penetrated her vagina with his penis. LS remained on the couch with her head down and could hear DS crying in the kitchen. Defendant then moved DS back to the closet and assaulted her again. Defendant held a gun throughout the assaults.

After defendant assaulted DS in the closet, he left the house and BS called the police. LS and DS were unable to identify the man who assaulted them. The roommate described the man who hit him as a black male, but was also unable to identify defendant as his assailant. At trial, BS identified defendant as the man who assaulted her, LS, and DS. She testified that she had never seen him before the night of the incident and had not seen him since that night.

Dr. Vincent Palusci examined LS and DS approximately six hours after the assaults. Dr. Palusci testified that his findings "were indicative of sexual conduct of direct trauma to the genitals, and in the case of [LS], also her anus, which were not explainable in any other manner than the histories provided" by the girls. Christine Dunnick, a forensic nurse, examined BS after the

assaults and found a "half a centimeter perianal tear, which is near the anal opening," consistent with the history provided by BS. Dr. Palusci and Nurse Dunnick collected evidence, including vaginal and rectal swabs, during the examinations and placed the evidence in rape kits. The kits were then sealed and released to the appropriate law enforcement agencies.

The trial court designated Rodney Wolfarth as an expert in the area of DNA analysis. Wolfarth conducted DNA testing on the swabs in the rape kits and the nightgown worn by LS during the assaults, as well as a fitted sheet, a pillowcase, and cigarette butts found at the scene. Wolfarth testified that he found sperm cells in the vaginal and rectal swabs taken from LS. When he tested the sperm cells from the rectal swab, "it was consistent with a mixture and the mixture was consistent with [LS] and an unknown semen donor, designated as Donor 1." Wolfarth found the same mixture on the nightgown and found DNA from Donor 1 on the fitted sheet, pillowcase, and cigarette butts. Wolfarth was unable to identify a match for the DNA at that time, but stated that once DNA testing is completed, the "probative DNA result is entered into what is a DNA data bank called CODIS, which stands for Combined DNA Indexing System." The data are stored to allow for comparisons to convicted felons' profiles at a later date. When a match is made between a DNA sample and a known profile, it is referred to as a CODIS hit.

At defendant's trial in this case, one of the prosecution's witnesses, LB, testified that defendant had sexually assaulted her in 2004, when she was 13 years old. LB told her sister that defendant had assaulted her and, shortly thereafter, the incident was reported to the police. DNA analysts subsequently determined that defendant's DNA matched sperm cells

from LB's vaginal swab and underwear. The results of the DNA testing were entered into CODIS.

On February 1, 2005, a CODIS hit occurred when the system matched defendant's DNA to the DNA samples taken in this case. Thereafter, a search warrant to conduct a buccal swab for defendant's DNA was obtained. Defendant was initially uncooperative, but eventually consented to the swab. Joel Schultze, who was designated by the trial court as an expert in DNA analysis, testified that the DNA sample was tested and compared to Wolfarth's previous findings. According to Schultze, the DNA material on the nightgown, pillowcase, fitted sheet, and cigarette butts were consistent with defendant's DNA. In addition, the DNA mixture in the rectal swab taken from LS was consistent with a mixture of DNA from LS and defendant at 10 of 13 locations. Defendant's DNA was not found on any of the swabs taken from DS, but Schultze explained that even if penetration occurs, "if there's no ejaculation, the male DNA is not going to be there." Schultze further testified: "In the Caucasian population the probability is 1 [in] 1.4 quintillion that [a] randomly chosen person would match the profiles on the cigarettes butts, nightgown, pillowcase and sheet. In the African-American, it's 1 [in] 188.9 quadrillion." As for the rectal swab match, "in the Caucasian population it would be approximately one to two million–one in one to two million people would be able to contribute to that mixture on the rectal swab. In the African-American, it would be one in approximately 100,000 to 175,000 African-Americans."

Defendant was convicted and sentenced as previously stated. He now appeals as of right.

II

Defendant argues that the trial court erred when it permitted Dr. Palusci and Wolfarth to testify by way of

two-way, interactive video technology. At trial, before the first witness testified by videoconferencing, defense counsel stated: "[M]y client has—wanted to question the veracity of these proceedings." On appeal, defendant argues that the testimony violated his constitutional right to confront the witnesses against him and was not properly admitted under any state statute or court rule. Because defendant failed to specifically object to the use of the video technology on these grounds at trial, this issue is unpreserved. See *People v McPherson*, 263 Mich App 124, 137; 687 NW2d 370 (2004).

## A

We review unpreserved claims of nonstructural, constitutional error for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999); see also *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005) (stating that a violation of the Confrontation Clause was not a structural error).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. [*Carines, supra* at 763 (citations omitted).]

Therefore, the error will only warrant reversal if the "plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (quotation marks and citation omitted).

The Sixth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, in pertinent part, that "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." US Const, Am VI; *People v Burton*, 219 Mich App 278, 287; 556 NW2d 201 (1996). The United States Supreme Court has recognized that a primary objective of the Confrontation Clause is to compel witnesses to "stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v United States*, 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895). The right of confrontation "is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Barber v Page*, 390 US 719, 721; 88 S Ct 1318; 20 L Ed 2d 255 (1968) (quotation marks and citation omitted). The required elements of the Confrontation Clause are: (1) physical presence, (2) an oath, (3) cross-examination, and (4) "observation of demeanor by the trier of fact . . . ." *Maryland v Craig*, 497 US 836, 846; 110 S Ct 3157; 111 L Ed 2d 666 (1990); see also *People v Pesquera*, 244 Mich App 305, 309; 625 NW2d 407 (2001). The combined effect of these elements ensures "that evidence admitted against an accused is reliable and subject to . . . rigorous adversarial testing . . . ." *Craig, supra* at 846.

The United States Supreme Court and this Court have also recognized, however, that the right of the accused to meet witnesses face-to-face is not absolute and the Confrontation Clause simply " 'reflects a *preference* for face-to-face confrontation at trial.' " *Id.* at 849 (emphasis in original; citation omitted); *Pesquera, supra* at 309. This preference " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Craig, supra* at 849, quoting *Mattox, supra* at 243; see also *Pesquera, supra* at 309-310. In *Craig, supra* at 840, 851-852, the United States Supreme

Court held that allowing the testimony of a child witness, who was alleged to be a victim of abuse, by way of one-way, closed circuit television did not violate the defendant's right of confrontation because the procedure adequately protected the other elements of the Confrontation Clause: the oath, the cross-examination, and the ability of the trier of fact to view the demeanor of the witness. The Court made clear, however, that this procedure may only be used if the prosecution shows it is "necessary to further an important state interest . . . ." *Id.* at 852. Therefore, if the prosecution wishes to have a child testify in such a manner, the trial court must hear evidence and make a case-specific finding that the procedure is necessary. *Id.* at 855. The Court held that "the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure . . . ." *Id.*

Like the United States Supreme Court, this Court recognized that presenting testimony over closed-circuit television did not violate the defendant's right of confrontation in two special circumstances. *Pesquera, supra* at 309; *Burton, supra* at 290-291. In *Pesquera, supra* at 312-314, this Court concluded that the taking of young sexual abuse victims' testimony by way of one-way, closed-circuit television did not violate the defendant's right of confrontation, noting that the trial court made specific findings that the children would be traumatized if they had to testify in front of the defendant and that the other elements of the Confrontation Clause remained intact. Similarly, in *Burton, supra* at 284, the trial court allowed a mentally impaired, adult victim of sexual abuse to testify by way of one-way, closed-circuit television after determining that this method was necessary to prevent causing the witness severe mental and emotional distress. This

Court recognized that for this special procedure to be used, the prosecution must "establish that the use of the procedure is necessary to further an important state interest" such as protecting the physical and psychological well being of a testifying victim. *Id.* at 288. The trial court must hear evidence and determine if the procedure is necessary. *Id.* at 290. The *Burton* Court found that there was an important state interest at stake and that all other aspects of the Confrontation Clause remained intact. *Id.* at 289-290. Therefore, the defendant's right of confrontation was not violated. *Id.* at 291. The Court cautioned, however: "In reaching this conclusion, we stress that our holding is not to be taken by the bench and bar as a blanket approval of the application of such methods in every case. Rather, excepting those cases that fall within the ambit of [statutory provisions for children or developmentally disabled victims], . . . the remedy afforded here should be applied only in the most extreme cases." *Id.*

*Craig, Pesquera,* and *Burton* addressed permissible exceptions to a defendant's right to face-to-face confrontation with regard to the taking of testimony from the alleged victims of a crime by way of one-way, closed circuit televisions. The present case involves the testimony of nonvictim witnesses by way of two-way, interactive video technology. Whether this use of such technology violates a defendant's confrontation rights is a question of first impression in Michigan.

The prosecution suggests that the videoconferencing procedure used in this case may be sufficiently equivalent to physical, face-to-face confrontation. We decline to so conclude. Perhaps, at some point in the future with further advances in technology, conducting trials by way of videoconferencing will be the norm, but we cannot now conclude that the "vital fabric of physical

presence in the trial process" can be "replaced at any time by an image on a screen," to the extent that "virtual presence is the equivalent of physical presence for . . . purposes of the Confrontation Clause." *Harrell v State*, 709 So 2d 1364, 1368-1369 (Fla, 1998).

The United States Courts of Appeals for the Second, Fifth, Sixth, and Eleventh circuits have all addressed the issue before this Court. *Horn v Quarterman*, 508 F3d 306 (CA 5, 2007); *United States v Benson*, 79 Fed Appx 813 (CA 6, 2003); *United States v Yates*, 438 F3d 1307 (CA 11, 2006); *Harrell v Butterworth*, 251 F3d 926 (CA 11, 2001); *United States v Gigante*, 166 F3d 75 (CA 2, 1999). The Fifth and Eleventh circuits held that the requirements articulated in *Craig*, that the court make a specific finding of necessity and that the other three elements of confrontation remain intact, apply to testimony by way of two-way, closed circuit television as well as one-way, closed circuit television. *Quarterman, supra* at 317-318 & n 17; *Yates, supra* at 1313; *Butterworth, supra* at 930.

In *Quarterman, supra* at 317, the Fifth Circuit held that the trial court did not infringe the defendant's right of confrontation when it allowed a critically ill witness to testify by two-way, closed-circuit television. The trial court made a case-specific determination of necessity at an evidentiary hearing, as well as a determination that the oath, cross-examination, and demeanor elements of the Confrontation Clause were all intact. *Id.* at 318. The Fifth Circuit concluded that "given the trial court's efforts to confirm [the witness's] illness and inability to travel and the care with which the other aspects of [the defendant's] confrontation rights were preserved, we cannot say that the decision to permit [the witness] to testify via two-way closed-circuit television constituted an unreasonable applica-

tion of established federal law." *Id.* at 317. In addition, the Fifth Circuit observed that "it is possible to view *Craig* as allowing a necessity-based exception for face-to-face, in-courtroom confrontation where the witness's inability to testify invokes the state's interest in protecting the witness . . . ." *Id.* at 320.

Similarly, the Eleventh Circuit held in *Yates, supra* at 1315, that in order to allow videoconferenced testimony, "[t]he [trial] court generally must: (1) hold an evidentiary hearing and (2) find: (a) that the denial of physical, face-to-face confrontation at trial is necessary to further an important public policy and (b) that the reliability of the testimony is otherwise assured." The Eleventh Circuit noted that "the prosecutor's need for the video conference testimony to make a case and to expeditiously resolve it are not the type of public policies that are important enough to outweigh the Defendants' rights, to confront their accusers face-to-face." *Id.* at 1316. In conclusion, the Eleventh Circuit observed:

> Should [the defendants] have wished to waive their rights to confrontation, they were able to do so. In the absence of such a waiver or case-specific findings of exceptional circumstances creating the type of necessity *Craig* contemplates, however, witnesses and criminal defendants should meet face-to-face. The Sixth Amendment so requires. [*Id.* at 1318.]

In contrast to the other circuits' decisions, the Second Circuit held in *Gigante, supra* at 81, that when a trial court used a two-way system, face-to-face confrontation was preserved and it was therefore unnecessary to enforce the requirements of *Craig*. However, while the Second Circuit did not apply the *Craig* standard, it noted that the trial court held an evidentiary hearing and made findings that the "crucial" witness was too ill to travel because he was suffering the final stages of

cancer and was under medical supervision. *Id.* at 79-80. Because of this illness, the trial court allowed the witness to testify by two-way, closed-circuit television. *Id.* at 80. The Second Circuit also observed that the procedure employed by the trial court preserved all the other "characteristics of in-court testimony . . . ." *Id.* Ultimately, it ruled that the testimony did not violate the defendant's right of confrontation. *Id.* Nevertheless, the Second Circuit warned that "[c]losed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness. There may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony." *Id.* at 81.

In 2003, the Sixth Circuit held that the reasoning of *Gigante* applied where an ill, elderly woman was permitted to testify by way of videoconferencing. *Benson, supra* at 820-821. The Sixth Circuit noted that the testimony had all the characteristics of in-court testimony and recognized that all the other elements of the Confrontation Clause were present. *Id.* Further, the Sixth Circuit concluded that there was sufficient evidence to support the contention that the witness was too ill to travel. *Id.* at 821. Therefore, the defendant was not deprived of his right of confrontation. *Id.*

While the Eighth Circuit has not addressed the particular issue presented in this case, it has considered whether the use of two-way video technology should be treated the same as the one-way system used in *Craig*. *United States v Bordeaux*, 400 F3d 548, 554 (CA 8, 2005). In *Bordeaux*, the Eighth Circuit noted that " '[c]onfrontation' through a two-way closed-circuit television is not different enough from 'confrontation' via a one-way closed-circuit television to justify different treatment under *Craig*." *Id.* It continued:

It is true that a two-way closed-circuit television creates an encounter that more closely approximates a face-to-face confrontation than a one-way closed-circuit television does because a witness can view the defendant with a two-way system. But two-way systems share with one-way systems a trait that by itself justifies the application of *Craig*: the "confrontations" they create are virtual, and not real in the sense that a face-to-face confrontation is real.

The virtual "confrontations" offered by closed-circuit television systems fall short of the face-to-face standard because they do not provide the same truth-inducing effect. The Constitution favors face-to-face confrontations to reduce the likelihood that a witness will lie. . . . Given the ubiquity of television, even children are keenly aware that a television image of a person (including a defendant in the case of a two-way system) is not the person[:] something is lost in the translation. Thus, a defendant watching a witness through a monitor will not have the same truth-inducing effect as an unmediated gaze across the courtroom. We are not alone in noting that something may be lost when a two-way closed-circuit television is employed, for even the *Gigante* court admitted that there may be "intangible elements" of confrontation that are "reduced or eliminated by remote testimony." Admittedly, the "confrontation" offered by a one-way system is, for lack of a better phrase, even more virtual because it depends on the witness envisioning the defendant to create the "confrontation." And one can imagine that this incremental step away from face-to-face confrontations results in a further diluted truth-inducing effect. That said, the touchstone for deciding whether a "confrontation" satisfies the Constitution is whether it is likely to lead a witness to tell the truth to the same degree that a face-to-face confrontation does, and in this respect two-way systems are like one-way systems: they both fall short.

*Gigante* does not persuade us that "confrontation" through a two-way [closed-circuit] television is constitutionally equivalent to a face-to-face confrontation because it neglects the intangible but crucial differences between a face-to-face confrontation and a "confrontation" that is

electronically created by cameras, cables, and monitors. We thus join the Eleventh Circuit in rejecting *Gigante's* view of the "confrontation" that two-way closed-circuit television systems afford. [*Id.* at 554-555 (citations omitted).]

Like the majority of federal courts that have examined this issue, we adopt the *Craig* test to determine whether a trial court infringes a defendant's right of confrontation when it allows witness testimony to be taken through two-way, interactive video technology. The trial court must hear evidence and make case-specific findings that the procedure is necessary to further a public policy or state interest important enough to outweigh the defendant's constitutional right of confrontation and that it preserves all the other elements of the Confrontation Clause. *Craig, supra* at 851-852, 855; *Quarterman, supra* at 318; *Yates, supra* at 1315; *Butterworth, supra* at 930-931. Our conclusion comports with this Court's approach in *Pesquera* and *Burton.*

Although the record indicates that the remaining three elements of the Confrontation Clause were present when Dr. Palusci and Wolfarth testified, the first prong of the *Craig* test (i.e., a specific finding that the procedure is necessary to further an important public policy or state interest) remains unsatisfied. The record is silent regarding the reason the trial court allowed Dr. Palusci and Wolfarth to testify by means of videoconferencing. There was some indication in the record that Wolfarth was ill, but he indicated at trial that "it's difficult to travel sometimes, yes, but it's not necessarily a health issue." Unlike the cases previously discussed, the record does not indicate that the trial court heard any evidence regarding the necessity of this procedure, nor did the trial court state what important public policy or state interest was being furthered. Given the absence of record evidence or any findings by

the trial court regarding the necessity of the videoconferencing procedure implemented in this case, we cannot determine whether defendant's constitutional right of confrontation was violated. Accordingly, we must remand for the trial court to hear evidence and make case-specific findings regarding whether the procedure was necessary to further a public policy or state interest important enough to outweigh defendant's confrontation rights.

B

The prosecution asserts that it was proper for the trial court to take Dr. Palusci's and Wolfarth's testimony by two-way, interactive video technology pursuant to MCR 6.006(C)(2). We disagree.

"Interpretation of a court rule is a question of law that this Court reviews de novo." *Wilcoxon v Wayne Co Neighborhood Legal Services*, 252 Mich App 549, 553; 652 NW2d 851 (2002). To interpret a court rule, "we apply the same rules as when we engage in statutory interpretation." *Id.* The overarching goal of rule interpretation "is to give effect to the intent of the authors." *Id.* To begin interpreting a court rule, the first step is to consider the language of the rule. *Id.* "If the language of the court rule is clear and unambiguous, then no further interpretation is required or allowed." *Id.* Nevertheless, "when reasonable minds can differ on the meaning of the language of the rule, then judicial construction is appropriate." *Id.* When necessary, we "will look to the dictionary definition of that term." *Burton, supra* at 286.

MCR 6.006(C) provides, in relevant part:

As long as the defendant is either present in the courtroom or has waived the right to be present, *upon a showing of good cause*, district and circuit courts may use

two-way interactive video technology to take testimony from a person at another location in the following proceedings:

\* \* \*

(2) *with the consent of the parties*, trials. A party who does not consent to the use of two-way interactive video technology to take testimony from a person at trial shall not be required to articulate any reason for not consenting. [Emphasis added.]

Pursuant to the plain language of MCR 6.006(C)(2), a trial court may take witness testimony by two-way, interactive video technology if: (1) the defendant is either present in the courtroom or has waived the right to be present, (2) there is a showing of good cause, and (3) the parties consent. Considering that the record in this case is silent with regard to the reason for the videoconferencing procedure implemented in this case, we cannot conclude that there was a showing of good cause. Nor can we conclude that defendant consented to the procedure. The prosecution argues that by failing to specifically object to the procedure, defendant consented. We cannot agree, however, that a party's silence or failure to specifically object to the taking of testimony by two-way, interactive video technology is the equivalent of consent. The court rule does not define the term "consent." It is defined by Black's Law Dictionary (8th ed) as "[a]greement, approval, or permission as to some act or purpose, [especially] given voluntarily by a competent person; legally effective assent." In this case, before the first witness testified by videoconferencing, defense counsel stated: "[M]y client has— wanted to question the veracity of these proceedings." Defense counsel's statement does not qualify as agreement, approval, or permission; in fact, it indicates that defendant objected to the videoconferencing procedure.

Additionally, in *People v Lawson*, 124 Mich App 371, 376; 335 NW2d 43 (1983), this Court noted that integral elements of the Confrontation Clause, including seeing the witness's demeanor, "must be personally waived by the defendant." Because this Court will not "presume that the defendant waived his constitutional right on the basis of a silent or sketchy record," we find that defendant did not waive his constitutional right to confront the two witnesses. *People v Montgomery*, 64 Mich App 101, 103; 235 NW2d 75 (1975).

On remand, the trial court must hear evidence and determine whether permitting Dr. Palusci and Wolfarth to testify by two-way, interactive video technology was necessary to further an important public policy or state interest. Because resolution of this issue in defendant's favor may obviate the need to address the other issues that defendant raises in this appeal, it is premature to resolve them at this time. We will therefore defer our analysis until after the remand.

Remanded for further proceedings consistent with this opinion and this Court's accompanying order. We retain jurisdiction.

*Order Entered August 25, 2009:*

PEOPLE V BUIE, Docket No. 278732. Pursuant to the opinion issued concurrently with this order, this case is remanded for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 35 days of the clerk's certification of this order and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the trial court must hear evidence and determine whether permitting Dr. Vincent Palusci and Rodney Wolfarth to testify via two-way interactive video

technology was necessary to further an important public policy or state interest. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.