*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

BRIAN MAXIE LAZARO,

       Defendant-Appellant.

UNPUBLISHED
August 26, 2021

No. 352317
Wayne Circuit Court
LC No. 20-000877-01-FC

Before: SAWYER, P.J., and BOONSTRA and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions of three counts of first-degree criminal sexual conduct (CSC-I) (perpetrator 17 years of age or older; victim less than 13 years old), MCL 750.520b(2)(b). Defendant was sentenced to 25 to 40 years' imprisonment for each of his CSC-I convictions. On appeal, defendant argues the trial court erred by (1) denying defendant's motion to strike the victim's testimony at trial and taking an active role in questioning the victim at trial, (2) admitting the text messages between the victim and her half-sister at trial, and (3) admitting the victim's medical records, which included a sexual assault diagnosis despite a lack of physical evidence. We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

This case arises from sexual abuse allegations by the minor victim (MW) against her biological father, defendant. Before 2016, the victim lived with her mother and spent the weekends with defendant at his and his wife's house. In 2016, the victim's mother moved to Mississippi, and she and defendant agreed to let the victim reside with defendant and attend the fourth-grade school year in Michigan.

At the conclusion of the school year, the victim moved to Mississippi to be with her mother. When the new school year began, a counselor from the victim's Mississippi school indicated to the victim's mother that the victim "wasn't participating [in class]or shows signs of neglect or abuse[,]" which the victim's mother attributed to the move. About a week later, the victim's mother found a piece of paper under the victim's bed that contained sexually explicative

-1-

statements.[1]  When the victim got home from school, the victim's mother asked about the note. The victim told her mother "you're gonna be mad at me.  [The victim's mother said] no, I'm not, just talk to me.  And that's when [the victim] said that's what happened to her.  And [the victim's mother] asked her who and [the victim] said her father."

At trial, the victim testified that, on more than 20 occasions, defendant forced the victim to engage in fellatio, until defendant ejaculated in the victim's mouth, and touch defendant's penis with her hand.  The sexual abuse primarily took place in defendant's house, with one occasion at a hotel.  The victim stated defendant would call the victim into his bedroom and tell the victim to close and lock the door.  On one occasion, defendant instructed the victim to go out his bedroom window and reenter the house through the front door when her half-sister was looking for the victim.  The victim stated the abuse had been occurring since she was very young, and ended when she moved to Mississippi in 2017.  The victim told her half-sister and two cousins about the abuse before telling her mother.  The victim's half-sister recalled occasions when defendant would call for the victim while she and the victim were playing and she would notice defendant's bedroom door shut but not did not see if the victim was inside the bedroom.

After the victim told her mother about the sexual abuse, the victim and her mother went to the Forest County Police Department, in Mississippi.  The police department advised the victim's mother to contact a police department in the county where the abuse took place, so the victim's mother contacted the Canton Police Department in Michigan.  On the way to the police department, the victim texted her half-sister about the abuse.  When the victim and her mother returned home, the victim's mother forwarded the text messages to Canton Police Detective Malone.  After reporting the allegations, Child Protective Services interviewed the victim at school, and the victim participated in a Kids' Talk interview.  In October 2017, the victim underwent a physical examination, which did not find any physical signs of sexual abuse.  A redacted version of the medical report was admitted at trial.

Throughout the victim's two-day testimony at trial, there were periods when the victim was unresponsive to the questions being asked.  Defense counsel objected numerous times on the basis that the victim was "nonresponsive."  During defendant's cross-examination of the victim, defendant moved to strike the victim's testimony, arguing the victim's failure to answer defense counsel's questions during cross-examination, including the contents of the note and whether the victim was being truthful, infringed on defendant's right to confront the witness making allegations against him.  The prosecution argued striking the victim's testimony was not warranted because her nonresponsiveness was not one-sided against defendant and the victim, overall, had answered defense counsel's questions.  The trial court denied the motion, noting the accommodations were made because of the victim's age, maturity level, and nature of the case.  The trial court acknowledged that the prosecutor and defense counsel had trouble eliciting answers from the victim, which weighed on the issue of credibility, but that the victim had not been entirely uncooperative. After the victim's cross-examination, defense counsel renewed his motion to strike the victim's testimony, arguing the trial court's leading questions and suggestive answers during the victim's cross-examination infringed on defendant's confrontation and due-process rights.  The

---

[1] It was revealed that the note was later lost in the victim and her mother's move back to Michigan.

prosecutor argued the trial court's questions and comments were merely for clarifying statements, and not leading or improper. The trial court denied defendant's renewed motion, finding the victim's difficulty in giving answers had not worsened or continued in the way that it had before defendant's initial motion to strike. The trial court reasoned:

> [P]erhaps my questioning would seem to suggest that I'm taking one side over the other or suggesting answers that she would of otherwise given, uh, that would otherwise affect the trial. Um, I, honestly I don't think, uh, I've done that in a way. . . . I try to be careful not to ask questions unless I'm looking for a clarification to an answer. And, um, let me just say I don't think that there's any—I, I think perhaps my line of questioning may be a little bit more, um, problematic if there were a jury. But as the fact finder I'm literally trying to help you and [the prosecutor], and particularly myself, in finding out the facts of this case and whether or not they meet the elements of the crimes charged.

> * * *

> Well, I'm gonna deny what I think is a motion for a mistrial because I don't think the, uh, defendant's—I don't think it's been established that the defendant's substantive due process rights have been violated as such that would demand a mistrial.

Defendant testified at trial, denying the sexual abuse allegations. The trial court found defendant guilty of all three counts of CSC-I. The trial court acknowledged the credibility issue with the victim's testimony, but concluded:

> [The victim was not] capable of putting together stories which talk about . . . what she did with her father in the bed, in the bathroom, uh, in the living room, and more specifically having to, having being told to exit a bedroom through a window and say where you were when you were some place else.

The trial court sentenced defendant to 25 to 40 years' imprisonment for each CSC-I conviction, to be served concurrently.

## II. ANALYSIS

The trial court did not err by (1) denying defendant's motion to strike the victim's testimony at trial or taking an active role in questioning the victim at trial, (2) admitting the text messages between the victim and her half-sister at trial, or (3) admitting the victim's medical records, which included a sexual assault diagnosis despite a lack of physical evidence.

### A. STANDARDS OF REVIEW

"The decision whether to admit evidence is within a trial court's discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). Accordingly, this Court reviews the trial court's evidentiary decisions for an abuse of discretion. *Id.*; *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Likewise, this Court reviews a trial court's ruling whether to grant a mistrial

for an abuse of discretion. *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009). A trial court abuses its discretion "when it selects an outcome outside the range of reasonable and principled outcomes." *Id*. at 645. Additionally, "[w]hether a defendant was denied his right to confront a witness is a constitutional question that we review de novo." *People v Jemison*, 505 Mich 352, 360; 952 NW2d 394 (2020). When this Court reviews a question de novo, it reviews the legal issue independently without deference to the lower court. *Id*.

However, to the extent an issue is unpreserved, this Court's review is limited to plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. Once these three requirements are met, reversal is required only when the plain error "resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and alterations omitted).

## B. MOTION TO STRIKE WITNESS TESTIMONY

Defendant first argues the trial court erred in denying defendant's motion to strike the victim's testimony at trial for being unresponsive, thereby infringing on defendant's confrontation right. We disagree.

"The Sixth Amendment of the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' " *Jemison*, 505 Mich at 360, citing Const 1963, art 1, § 20. "The state of Michigan has at all times afforded a criminal defendant the right to be confronted with the witnesses against him, [by] adopting this language of the federal Confrontation Clause verbatim in every one of our state constitutions." *People v Nunley*, 491 Mich 686, 697; 821 NW2d 642 (2012) (quotation marks and citation omitted). "The required elements of the Confrontation Clause are: (1) physical presence, (2) an oath, (3) cross-examination, and (4) observation of demeanor by the trier of fact . . . .." *People v Buie*, 285 Mich App 401, 408; 775 NW2d 817 (2009) (quotation marks and citation omitted). In general, unresponsive, or volunteered, testimony to a proper question is generally not grounds for a mistrial. *Waclawski*, 286 Mich App at 710. "A mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *Id*. at 708 (quotation marks and citation omitted).

The trial court did not err in denying defendant's motion to strike the victim's testimony at trial for being unresponsive. A review of the record indicates the requirements of the Confrontation Clause were satisfied because the victim was present with defendant in the courtroom, she was questioned under oath before the trier of fact, and defense counsel cross-examined her. While we, and the trial court, acknowledge that the victim was unresponsive at times throughout her two-day testimony, such unresponsiveness did not impair defendant's ability to get a fair trial. The record indicates the victim largely had difficulty answering questions about the specific details of her sexual abuse because of the nature of the abuse and about the specific details of her previous testimony:

*Defense Counsel*: And, and if I asked you to go to page 18, line two and three. Can you see it or does that have to be moved? Do you remember what you said?

*The Victim*: Yeah.

*Defense Counsel*: What did you say at the other hearing?

*The Victim*: No.

*Defense Counsel*: You were asked if you remembered anything about what was on the paper or the note and you answered no. Correct?

*The Victim*: Yeah.

*Defense Counsel*: And that was different than what you answered yesterday about what was on the note, right? [MW], that was different than what you wrote than what you answered yesterday about what was on the note. Right?

*The Victim*: Yeah.

*Defense Counsel*: Were you telling the truth in that hearing? At the exam? [MW], were you telling the truth when you gave that answer at the exam? Your Honor, I'm placing another—

*The Trial Court*: All right.

*Defense Counsel*: —objection. The witness being nonresponsive.

*The Trial Court*: Can you answer the question, [MW]? And if it would help you to give a more of an explanation about why perhaps, you know, uh, the answers may be different or slightly different at some point, you can do that, too. Okay?

*The Victim*: Okay.

*  *  *

*Defense Counsel*: [MW], when your mom—when you discussed for the very first time the allegations that you have made against your father to bring to this court here today, it wasn't because your mom found a note under your bed, true? Wasn't a note?

*The Trial Court*: You can go ahead and answer.

*Defense Counsel*: I'm going to object, your Honor. The witness is nonresponsive to the question.

*The Trial Court*: All right. Again, [MW], is there something you don't understand about the question? All right. Let me ask you this, [MW]. Do you remember when you first told your mom?

*The Victim*: I remember, but I don't remember when.

*The Trial Court*: All right. And do you remember whether before you told her whether she confronted you about something upon your iPhone or was it because of a note that she found or both?

*The Victim*: Notes.

*The Trial Court*: I'm sorry.

*The Victim*: Notes. Note.

*The Trial Court*: Okay. Did she ever confront you at all about because she found you something—because she found you watching something that you shouldn't have been on your iPhone? Let me ask the question this way. Did your mom ever find you watching something on your iPhone like pornography?

*The Victim*: No.

Additionally, the victim's unresponsiveness was not limited to cross-examination but also occurred when the prosecutor and the trial court asked the victim questions:

*Prosecutor*: [S]ince this case started have you been able to see, um, dad's side of the family?

*The Victim*: No.

*Prosecutor*: Okay. And how does that make you feel? Can you tell us? Do you need a break? No? Okay. How do you feel that you don't get to see dad's side of the family anymore? Can you tell us in one word? [MW], feel good about it, bad about it, or something else? You need to take a break? Judge, I would just note for the record that the victim is not answering questions anymore and—

*The Trial Court*: All right.

\* \* \*

*Defense Counsel*: How would [your mother] discipline and punish you? Your Honor, I'm gonna object. The witness is being nonresponsive to my question.

*The Trial Court*: All right. Could you please answer the question, [MW]. In other words, you know, it's a simple question. You know, would your mother—and I don't know what happened if anything, right. You know, did she lock you in a room, force you to sit in a corner and take away your, you know, computer games,

you know. It—I, I don't know what she'd of done. I don't wanna suggest an answer, but, you know, she have you write an essay.

*Defense Counsel*: You want me to move on, Judge, or this I can stay here?

\* \* \*

*Defense Counsel*: [MW], were you entirely—were you truthful, entirely truthful when you testified in front of the other judge in this matter?

*The Trial Court*: Do you understand the question, [MW]?

*The Victim*: Yeah.

*The Trial Court*: Okay. Please provide an answer. Well, let me ask you this, [MW]. Why, why are you having difficulty providing an answer?

*Defense Counsel*: I'm objecting, your Honor. The witness is nonresponsive.

*The Trial Court*: All right. Go ahead. It seems like you're about to spit it out but you're not doing it. Are you worried about something?

*The Victim*: No.

Further, when the question was rephrased, the victim was permitted to write her answer on paper, the victim's grandparents were asked to leave the courtroom, or when the trial court took a break from testimony, defense counsel was able to obtain an answer to his question or move past the victim's unresponsiveness:

*Prosecutor*: Could you write the words down [that were on the note]?

*The Victim*: Yeah.

*Prosecutor*: Okay. Okay. I'm handing you a, um, plain piece of paper and I [have] a red pen, okay. And just look up when you finish. Did you finish? Yes? Okay. I'll come take the paper. Okay. And I'm gonna show it to, um, defense counsel, okay. Um, [MW], I'm gonna read this in and will let me know if this is what you wrote on the paper. It had inappropriate words. Is that right?

*The Victim*: Yeah.

\* \* \*

*Prosecutor*: I'm handing you another blank, um, page and a red pen. And will you answer the question did you send that text to [your half-sister]. Thank you. Okay. You done? Okay. I'll come take the paper and the pen. And I'm gonna

show it to defense attorney. What the paper says I guess. I never knew I sent that to her. I thought[t] those were different [text messages]. Is that right?

*The Victim*: Yeah.

\* \* \*

*The Trial Court*: [C]learly we're having difficulty with [the victim], um, providing answers to questions. And certainly as I indicated before, some of these subjects are very difficult and you're dealing with family members and not wanting to embarrass yourself or perhaps anger family members, uh, because of responses. Um, you know, I think that may be part of the hesitation. I can only speculate. I don't know what's going through her head, but it seems like, uh, a reasonable explanation. . . . So, in an effort to, uh, provide a little more comfort and also ensure that people, uh, particularly the family members, uh, can, uh, see everything that's going on, I'm gonna have, uh, [defendant's parents] go back into my law clerk's office and view, uh, and listen to this, uh, back from his office, all right.

\* \* \*

*Defense Counsel*: Will you look at page 32. Line 21 to 23. Could you read it to yourself.

*The Victim*: What was it again.

*The Trial Court*: Page 32, lines 21 through 23.

*Defense Counsel*: Do you remember me asking you that question?

*The Victim*: No.

*Defense Counsel*: Do you remember providing that answer?

*The Victim*: No.

*Defense Counsel*: Were you being honest when you gave that answer?

*Prosecutor*: Judge, I think she just said she doesn't remember.

*The Trial Court*: All right. Well, I think perhaps the question since she says she doesn't remember, ask that same question again and see what response you get.

*Defense Counsel*: Now, [MW], your mom found out about it when she spoke to you about what you were watching on your iPhone.

*Prosecutor*: That's a statement. You need to say your mom find out about it.

-8-

*Defense Counsel*: Well—

*The Trial Court*: Well—

*Defense Counsel*: She can either agree or disagree with my statement. It's a question. I'll put it in a question form.

*The Trial Court*: Well—

*Defense Counsel*: No worries. [MW]—

*The Trial Court*: And when you say it, perhaps we should clarify what it is.

*Defense Counsel*: No problem, your Honor. [MW]—now, [MW], your mother found out about the allegations you've made against your father that bring us here to court today because when she spoke to you be—about it, when she spoke to you regarding what you were watching on your iPhone.

*The Trial Court*: You understand that question?

*The Victim*: No.

*Defense Counsel*: Is that a no?

*The Trial Court*: It was a no. All right. Now, [MW], I want, I want to be clear. If at some point you don't understand a question, please say I don't understand the question. Please ask it over again. Because if you don't say that and you don't say anything, you're just gonna, you know, delay the time and extend the time that we're gonna be here, okay. It's okay if you don't understand the questions. Just say so.

On this basis, defendant was afforded the right to confront the witnesses against him. *Buie*, 285 Mich App at 408. Because the Confrontation Clause merely "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish[,]" the trial court did not err in denying defendant's motion to strike the victim's testimony for periods of unresponsiveness. *People v Ho*, 231 Mich App 178, 189; 585 NW2d 357 (1998) (quotation marks and citation omitted).

## C. JUDICIAL MISCONDUCT

Next, defendant argues the trial court erred in denying defendant's motion for a mistrial after taking an active role in questioning the victim. We disagree.

A trial judge has broad, but not unlimited, discretion when controlling the court's proceedings. *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995). Under MRE 614(b), a trial court may interrogate witnesses at trial. MRE 614(b). "A judge, unlike a juror, possesses an understanding of the law which allows him to ignore such errors and to decide a case based solely on the evidence properly admitted at trial." *People v Taylor*, 245 Mich App 293, 305;

628 NW2d 55 (2001) (quotation marks and citation omitted). Accordingly, in a bench trial, the trial court has more discretion to question witnesses than during a jury trial. *People v Wilder*, 383 Mich 122, 124-125; 174 NW2d 562 (1970). "However, the trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *People v Conyers*, 194 Mich App 395, 405; 487 NW2d 787 (1992). "[T]he central object of judicial questioning should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *People v Stevens*, 498 Mich 162, 178; 869 NW2d 233 (2015).

The test to determine whether the trial court's conduct violated a defendant's constitutional guarantee to a fair trial, is whether, when considering the totality of the circumstances, "it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. Likewise, "[a] mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *Waclawski*, 286 Mich App at 708 (quotation marks and citation omitted). In reviewing the totality of the circumstances, this Court should look at a variety of factors, including:

> [(a)] the nature of the judicial conduct, [(b)] the tone and demeanor of the trial judge, [(c)] the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, [(d)] the extent to which the judge's conduct was directed at one side more than the other, and [(e)] the presence of any curative instructions. [*Stevens*, 498 Mich at 172.]

The trial court did not err by denying defendant's motion for a mistrial after asking the victim questions during her testimony during trial. To support his argument, defendant contends the trial court's handling of trial counsel's objections to the victim's unresponsiveness by asking questions, allowing the victim to write some answers, and giving the victim a selection of answers to choose from warrants a new trial. While defendant does not argue that this conduct amounted to an overt bias by the trial judge, defendant does argue that the questioning conducted amounted to judicial bias or impropriety. However, the record indicates that the nature of the trial court's conduct was intended to help the parties to collect information for the record to establish or refute elements of the sexual abuse charges. In fact, most of the trial court's questions and comments during the victim's testimony were aimed at assuring the 12-year-old victim that it was safe and necessary to talk about the abuse:

> *The Trial Court*: Okay. Realize sometimes these are difficult answers, right, but there's no reason to be afraid, okay. Sometimes it can be embarrassing. Don't worry about it, okay. This is stuff that we deal with all the time and nobody's gonna think anything about the answer. All you have to do is provide a truthful answer, okay.
>
> *The Victim*: Okay.
>
> *The Trial Court*: All right. So just take a deep breath. Let it out. And if it's easier to focus on this nice lady over here and give the answer versus [defense counsel] or somebody else, you can do that, too. Okay?

-10-

*The Victim*:  Okay.

*The Trial Court*:  Or if you wanna just look down, focus on a little bug in the carpet, whatever you want, but we do have to have an answer, all right.

\* \* \*

*The Trial Court*:  We got, we got a deputy over here.  So you out—have every reason to feel safe.  Nobody's gonna threaten you, okay.  So and I'm not suggesting that anybody has.  I just want you to know this is a safe environment. You just need to provide an answer, okay.

*The Victim*:  Okay.  Um, there just stuff I don't want [my mother] to know or, um, don't want to tell her.

\* \* \*

*The Trial Court*:  All right.  So, um, as I explained before, . . . I understand this is difficult.  It's not easy.  It's not easy for an adult to talk about these types of issues, okay.  Uh, but we do need an answer.  And, um, it's just easier, you know, and if, if there's something that you think would make it easier that, you know, provide an answer, let us know.  Uh, we wanna, you know, make sure you get through this.  Um, everybody wants to get through it.  Um, you ever have a cut?

*The Victim*:  Hum?

*The Trial Court*:  You ever, you ever skin your knee or cut your arm? Have a bandaid?

*The Victim*:  Yeah.

*The Trial Court*:  Okay.  And after it's healed, you gotta pull the bandaid off, right?

*The Victim*:  Yeah.

*The Trial Court*:  Okay.  Now, when you pull the bandaid off, does it hurt more if you do it slow or fast?

*The Victim*:  Slow.

*The Trial Court*:  Slow.  So think about this process like that, right. Sometimes it's easier just to sort of, you know, do it quickly rather than drag it out because sometimes the longer it takes the more anxiety, the more nervous you became [sic].  So, remember you don't have anything to fear here, right?

Because the victim's testimony was central to the evidence in this case, it was evident that the trial court's intent was to encourage the victim to give full and more exact answers to the parties'

questions and additional relevant information. *Stevens*, 498 Mich at 178. "Judicial questioning might be more necessary when a judge is confronted with a difficult witness who refuses to answer questions posed by attorneys or repeatedly responds to those questions with unclear answers[.]" *Stevens*, 498 Mich at 175-176. On this basis, the trial court's comments and questions were limited in scope to the relevant matter and proper to maintain control over the trial.

In addition, while this Court does not have the benefit of viewing the trial court's tone and demeanor from the record, *id.* at 176, we do not perceive any ill or hostile tone from the trial court during the victim's testimony. As stated, the trial court's comments and questions predominately centered on making the victim feel comfortable and safe in answering the parties' questions. Moreover, the trial court's participation was not directed toward a particular party more than the other. "Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct." *Id.* at 177. While defendant placed nearly all of the objections for the victim's unresponsiveness on the record, the trial court's intervention was not limited to cross-examination. The victim had difficulty answering questions posed by the prosecutor and defense counsel, and the trial court intervened, rephrasing the question, encouraging the victim to write her answer, or giving examples to encourage the victim to respond:

> *The Trial Court*: I'll allow [the victim to write down her answer] over, over [defense counsel's] objection. But I can't—we can't do—
>
> *Prosecutor*: Right.
>
> *The Trial Court*: — this for every single question that's being asked. I mean some of these questions are involving, you know, sort of sensitive private sexual matters. They have to do with more basic stuff.
>
> *Prosecutor*: Right.
>
> *The Trial Court*: I mean I—let me. [MW], we're gonna be here today, tomorrow, you know, unless these questions get answered, all right. I, I don't wanna be difficult. I realize that this is hard. Courts are not fun. They can be intimidating. Nobody wants to sit across from their dad and say these difficult things. I understand all of that, okay. But I, I just need you to try to work with us as best you can. Again, if you need a break, that's fine. If you wanna look at the, the advocate or down at the floor and answer the questions, that's fine, too. Um, and if, again, if you need a break, I'm happy to take a break.

> \* \* \*

> *Defense Counsel*: [MW], were you ever there when your mother spoke about this to any other persons? Were you ever there when your mom spoke with any other persons about this?
>
> *The Victim*: Can you say it again?

-12-

*Defense Counsel*:  Sure.  Were you ever there when your mother spoke to other persons about what you disclosed to her regarding your father that brought us here to court?  I'm objecting, your Honor, to the witness being nonresponsive to the question.

*The Trial Court*:  All right.  [MW], is there something you don't understand about the question?

*The Victim*:  No.

*The Trial Court*:  Okay.  So, is there a reason you can't provide an answer?  In other words, were you there in a room when your mom was speaking to other people about the things that you say happened between you and your dad?  So your mom could—you could of been there when your mom was on the phone speaking with somebody.  You could you have been in the same room just listening, right.  Did any of those types of circumstances ever occur?  Is it yes, no, or I don't remember?

*The Victim*:  I don't remember.

Further, we note that no formal curative instructions were given; however, because defendant's trial was a bench trial, the absence of a curative instruction is less significant.  As the fact-finder, the trial court had a clear understanding of law, *Taylor*, 245 Mich App at 305, stating "in a bench trial, . . . I'm the, I'm the finder of fact, I mean I think I recognize it for what it is.  And I think I can, you know, perhaps be a little bit more savvy, although some may say differently than, than a jury."

Accordingly, considering the totality of the circumstances, it is evident the trial court played an active role in eliciting the victim's testimony.  However, the trial court's conduct did not show any bias against defendant, or deprive defendant of his right to confront the victim.  Instead, the questioning and other methods used by the trial court helped the parties obtain additional information from the victim and proceed through the trial.  Further, the trial court's even-handed participation in defendant's bench trial, did not deprive defendant of a fair trial.  *Wilder*, 383 Mich at 124-125; *Conyers*, 194 Mich App at 405.  As a result, the trial court did not abuse its discretion when it denied defendant's motion for a mistrial and did not engage in any impropriety.

D.  TEXT MESSAGES

Defendant argues the trial court erred in admitting the text messages between the victim and her half-sister at trial because the text messages amounted to inadmissible hearsay.  We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."  *Aldrich*, 246 Mich App at 113.  Because defendant objected to the admission of the text messages for a lack of foundation, and not as inadmissible hearsay, the issue is not preserved for appellate review.

-13-

Accordingly, as stated, this Court's review is limited to plain error affecting substantial rights. *Carines*, 460 Mich at 763.

Hearsay is an oral or written "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay evidence is not admissible unless it qualifies under an exception to the rules of evidence. MRE 802. A statement is not hearsay if it is offered for a purpose other than to prove the truth of its contents. *People v Mesik (On Reconsideration)*, 285 Mich App 535, 540; 775 NW2d 857 (2009).

To start, we note that defendant waived any appellate challenge to the admission of the text messages because defense counsel expressed that he had no specific objection to the admission of text messages, rather defense counsel only initially objected for a lack of foundation. "This Court has defined waiver as the intentional relinquishment or abandonment of a known right." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Buie*, 491 Mich at 306 (quotation marks and citation omitted). "Defense counsel cannot acquiesce to the court's handling of a matter at trial, only to later raise the issue as an error on appeal." *Id*. at 312 (quotation marks and citation omitted). Allowing defendant to assert as error on appeal an issue that he deemed proper at trial would allow defendant to "harbor error as an appellate parachute." *Id*. Accordingly, defendant waived this argument in the trial court by expressly stating that he had no other objection to the admission of the text messages between the victim and her half-sister.

Regardless, to the extent the trial court relied on the text messages in its decision to convict defendant, such consideration was not in error. The text message conversation between the victim and her half-sister was as follows:

> *The Victim*: Hey don't lie about this but did daddy make you do it
>
> *The Victim*: Where you at
>
> *Half-sister*: My mom
>
> *Half-sister*: Did what
>
> *The Victim*: Ok
>
> *The Victim*: You know nasty stuff
>
> *Half-sister*: Oh no he has Andra
>
> *The Victim*: He hasn't ever did it yet
>
> *Half-sister*: IDK but he took more pictures
>
> *The Victim*: Oh well daddy might go to jail for it and I told her you did it

-14-

*The Victim*:  Hello

*The Victim*:  Did he

*Half-sister*:  Why I never said he did

*Half-sister*:  And no

*The Victim*:  Did he do it to u [sic] the disgusting stuff

*Half-sister*:  No

*The Victim*:  What but you said he did it to you one time

*Half-sister*:  No I dinnt [sic] I was talking about u [sic]

*The Victim*:  So I just lied about it and I have to talk to the police

*The Victim*:  U [sic] said one time great thanks a lot [sic].

*Half-sister*:  Why you call the cops don't you love daddy

*The Victim*:  Yes but I didn't call them my mom swell [sic] something and
I do love him

*Half-sister*:  U [sic] told your mom

*The Victim*:  No, yes but I had to she said don't lie and I didn't [sic]

*Half-sister*:  Wait call me Now!!!!

*The Victim*:  Ok

*Half-sister*:  Go

*The Victim*:  Ok

*Half-sister*:  Can't talk no more going to bed

*The Victim*:  Ok goodnight I had to got it the police station [Texts.]

A review of the record indicates the trial court relied on the text messages to determine the victim's credibility, rather than proof of the allegations against defendant.  In fact, the trial court stated that the text messages and the half-sister's testimony helped form its conclusion that the victim was "most truthful when she was texting with [her half-sister]."  Moreover, most of the victim's text messages are questions to her half-sister, confirming abuse suffered by her half-sister that she had previously told the victim about.  Because the nature of a question is incapable of being true or false nor an assertion of fact, a question is generally not hearsay.  *Mesik*, 285 Mich App at 540; *People v Jones*, 228 Mich App 191, 221 n 14; 579 NW2d 82 (1998).  On this basis,

the text messages were not offered for the truth of the matter asserted. We note the only relevant assertion of fact within the text messages was the half-sister's statement that defendant "took more pictures" of her; however, because defendant was not charged with taking pictures of a minor, this statement did not amount to inadmissible hearsay. As a result, the trial court properly admitted the text messages at trial because they were not statements offered for the truth of the matter asserted.

Nonetheless, even to the extent the text messages constituted inadmissible hearsay, we conclude that defendant failed to establish the admission amounted to a plain error affecting his substantial rights. *Carines*, 460 Mich at 763. As stated, the trial court relied on the text messages as support of the victim's credibility, not as evidence for finding that defendant sexually abused the victim. While the victim's credibility was a key factor in the trial court's decision, the text messages were not the only evidence relied on to assess the victim's credibility. Rather, the trial also relied on the detail in the victim's testimony when recounting the sexual abuse, the difficulty the victim had talking about the sexual abuse with her mother and at trial, and the half-sister's testimony that the victim had told her about being sexually abused by defendant when they were younger. Additionally, because the victim's half-sister denies that defendant ever abused her in the text message exchange, there is a lack of prejudice to defendant in their admission. Moreover, the trial court expressed concern with the victim's unresponsiveness during her testimony at trial and the preliminary examination, the half-sister's testimony that the victim is not a truthful person, and the missing note. However, the trial court ultimately concluded that the victim "clearly loves her father" and did not have "the motive to make up stories of fellatio involving her father." Instead, the trial court found the victim "never intended to reveal anything" regarding the sexual abuse and had great difficulty in speaking to adults, including her mother, about the sexual abuse. On this basis, the admission of the text messages did not significantly affect the outcome of defendant's trial. Therefore, because defendant has failed to establish that the admission amounted to a plain error affecting his substantial rights, reversal is not warranted. *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018).

Further, we note defendant's brief argument that the text messages were inadmissible because they were a prior consistent statement. A prior consistent statement is a statement that is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]" MRE 801(d)(1)(b). The record indicates that the prosecutor sought to admit the text messages during the victim's direct examination as support of the victim's credibility, and not to rebut an accusation of "recent fabrication," the text messages were not inadmissible as prior consistent statements. The text messages were exchanged after the victim was interviewed by police. Arguably, "a consistent statement made after the motive to fabricate arose does not fall within the parameters of the hearsay exclusion for prior consistent statements." *People v Rodriquez (On Remand)*, 216 Mich App 329, 332; 549 NW2d 359 (1996). Regardless, to the extent that admission of any portion of the text messages constituted error, it should be construed as harmless. See *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000) (discussing outcome-determinative error). Because defendant has failed to establish "it is more probable than not that the error in question undermine[d] the reliability of the verdict, thereby making the error outcome determinative, reversal is not warranted." *People v McCray*, 245 Mich App 631, 643; 630 NW2d 633 (2001) (citations and quotation marks omitted).

## E. MEDICAL RECORDS

Defendant argues the trial court erred in admitting the victim's medical records, which included a sexual assault diagnosis despite a lack of physical evidence. We disagree.

As stated, hearsay is an oral or written "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay evidence is not admissible unless it qualifies under an exception to the rules of evidence. MRE 802. Hearsay exceptions applicable to records include:

> (4) Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection With Treatment. Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.
>
> * * *
>
> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. [MRE 803(4) and (6).]

The trial court did not err in admitting the victim's medical records at trial. We first note the trial court explicitly did not rely on the victim's medical records in its conviction of defendant, stating:

> I would note that, um, in reaching my decision, uh, I . . . did not rely on the . . . Medical Center records. Um, my analysis is literally based upon the testimony of [the victim] . . . and the other witnesses[.]

To the extent the trial court did rely on the victim's medical records in its decision to convict defendant, such consideration was not error. The victim's medical records largely include statements made for purposes of medical evaluation after the victim reported to her mother that she had been sexually abused by defendant. There is also no question that a patient's medical records are routinely made in the course of a medical provider's business. As a result, the victim's medical records qualify under recognized hearsay exceptions. MCL 803(4); MRE 803(6). Further, the medical records were authenticated by an affidavit from a representative of the medical

center, testifying that the records are what the prosecution claims. While defendant contends the lack of physical evidence of sexual abuse in the medical records makes them inadmissible as evidence that defendant sexually abused the victim, this basis does not disqualify the medical records from admission under the hearsay exception. Regardless, contrary to defendant's argument, we note that the medical records plainly stated that the victim's examination "neither confirms or denies previous maltreatment." In fact, the medical records specify throughout the report that sexual abuse was merely suspected or reported by the victim, reporting "[the victim] indicated that [defendant] made her perform fellatio on him multiple times. [The victim] indicated that [defendant] ejaculated in her mouth."

Defendant does, however, arguably raise, on appeal, a legitimate concern that his identification as the perpetrator of abuse of the victim in the medical records should have been omitted or redacted. As previously discussed by our Supreme Court, regarding the admissibility of a medical record under MRE 803(4):

> The statement in the medical record relating that the plaintiff's injury resulted from his arm going through a plate glass window was information reasonably necessary for diagnosis and treatment. This statement carries with it the inherent indicia of trustworthiness in accordance with the rationale underlying the medical records exception. However, the statement in the medical record relating what occurred before the plaintiff's arm went through the window, i.e., he had a fight with his girlfriend, was not reasonably necessary for diagnosis and treatment and, thus, falls outside the rationale underlying the exception. [*Merrow v Bofferding*, 458 Mich 617, 630; 581 NW2d 696 (1998).]

Hence, for purposes of diagnosis and treatment it was necessary to know the abuse encountered by the victim, but not necessarily the identity of the perpetrator. As recognized by this Court, in *People v DePlanche*, 183 Mich App 685, 690; 455 NW2d 395 (1990) (citation omitted), such "testimony is inadmissible because the identity of an assailant cannot be characterized as the 'general cause' of an injury, and such testimony was not of the sort contemplated by the drafters of MRE 803(4). Merely because the statements were made to a medical doctor is an insufficient basis for" admission.

In particular, the circumstances of this case demonstrate that the examination of the victim occurred well after the alleged incidents of abuse and the accusations against defendant had occurred. While the identity of the perpetrator may be useful in determining a treatment plan for the victim and assuring her safety, the medical records could be viewed as used not only to determine whether the victim required specialized services such as therapy, but also to substantiate the claims of abuse. Defense counsel did not, however, object on this basis, challenging only any inclusion of statements to medical personnel by the victim's mother, which were redacted before the report was admitted into evidence, and an implied assertion that the findings or diagnosis by medical personnel relied, at least in part, on statements made by the victim's mother and were not solely attributable to statements from the victim.

Consequently, given these circumstances and the trial court's indication as the fact-finder that it did not rely on the medical records in conviction of defendant, the medical records were generally admissible under the referenced hearsay exception and any alleged error in failing to

redact a brief reference to defendant as the alleged perpetrator of the abuse does not constitute reversible error. In particular, because the medical records indicated an inability to confirm the abuse allegations, the admission of the records did not serve, as alleged by defendant, to improperly bolster the victim's credibility.

Affirmed.

/s/ David H. Sawyer
/s/ Mark T. Boonstra
/s/ Michelle M. Rick