*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 7, 2024

Plaintiff-Appellee,

v

No. 359205
Macomb Circuit Court
LC No. 2019-000996-FC

JOE WESLEY STRAWS III,

Defendant-Appellant.

Before: HOOD, P.J., and SHAPIRO and YATES, JJ.

PER CURIAM.

Defendant, Joe Wesley Straws III, appeals as of right his jury trial convictions for armed robbery, MCL 750.529; felon in possession of a firearm, MCL 750.224f(1); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Straws as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 15 to 30 years each for the armed robbery and the felon-in-possession convictions, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We vacate the convictions due to Confrontation Clause violations and remand for a new trial.

## I. BACKGROUND

Straws's convictions stem from a robbery at AR Appliance in Roseville on an afternoon in September 2016. At trial, the prosecution presented evidence that a man entered the store on three separate occasions that day. During his first visit to the store, the man told Sozan Yalda, the cashier and owner's sister, that he intended to purchase a stove and refrigerator for his mother. The man negotiated a price, but left before purchasing the appliances saying he had to speak with his mother first. During the second visit, the man informed Yalda that he would use credit for the purchase. Yalda wrote down the name ("Shawn Robinson"), the address (a location on Cherrylawn in Detroit), and the phone number that the man provided. After Yalda asked for the man's credit card and license, the man left again purportedly to retrieve his license. He soon returned, indicating that he would pay in cash. When Yalda asked for the cash, the man questioned why Noor Ramoo, the owner and Yalda's brother, and another man (their cousin), were standing nearby, and stated that he did not feel comfortable. Ramoo eventually told the man that he could buy from another

-1-

store if he was uncomfortable, and the man questioned who Ramoo was "talking to . . . like that." After additional similar exchanges between the man and Ramoo, the man pulled a gun from his waistband, pointed the gun at Ramoo's face, and instructed Ramoo to "take out what—whatever you have in your pocket." The man then put the gun on Ramoo's face, as he unsuccessfully tried to take Ramoo's wallet out of his pocket. The man then grabbed Ramoo's Bluetooth neckband headphones from Ramoo's neck and fled, dropping the Bluetooth before he left the store.

The police arrived shortly after the incident, and Ramoo and Yalda separately provided descriptions of the man. Yalda described the man as tall and skinny, with a little facial hair, and a mark that was a "burn or something" under his eye. Ramoo described the man as light-skinned, taller than him, skinny, bald with short hair on the side of his head, bearded, and with a small pink scar under his left eye.

Yalda also provided the police with the invoice, where she had written the name, address, and telephone number that the man provided. The officer-in-charge, Detective Sergeant Robert Gudenau, testified that the name on the invoice, "Shawn Robinson," was associated with the address the man provided. He testified that the phone number was registered to Malique Odin, who previously lived at the address.[1]

Later that same day, Ramoo and Yalda went to the police station to view photographic arrays in an attempt to identify the man. They had separate identification procedures. Neither was present for the other's identification. And Detective Gudenau described the identification procedure as a "double-blind" method, meaning a different officer, who had no information, administered the lineups. The police recorded the identifications, and a portion was played at trial. Based on the information that Ramoo and Yalda provided, the police generated a six-person photo array that included a photograph of Malique Odin and five other individuals generated based on the descriptions they provided of the man that came to the store. The photos were black and white, and the contrast on the photo of Odin was stark, with his skin appearing so dark as to make many of his facial features difficult to discern.

Neither Ramoo, nor Yalda, identified Odin, who was photo #5 in the array, with certainty. Ramoo signed a statement prepared by the police that read, "#5. Is there a scar on right side? And how long ago picture taken[?] #5 is close ~~100% yes~~ for number 5 and 100% no for other photographs. No hair on top and more skinny [sic] [.]" Yalda signed a statement prepared by the police that read, "folder #5, but the man had no hair on top, hair on side. A scar on left side of face pink color, as if burned. Very skinny." These statements were introduced at trial along with a video recording of the identification procedure. At trial, both Ramoo and Yalda denied identifying Odin.

---

[1] The record is unclear on how the address was "associated with" Shawn Robinson, or how Detective Gudenau was able to testify that Malique Odin previously lived at the address. It is unclear if the source of this information is so-called law enforcement databases, interviews, or something else. This aspect of the testimony is not the subject of the appeal, but it is closely related to the Confrontation Clause issues described in Section II of this opinion.

After the attempted identification, the police continued the investigation and eventually narrowed the target of investigation to Straws. The day after the incident and photo-lineup involving Odin, Detective Gudenau visited the address provided on the invoice. There, he spoke with Joanne Oglesby, who identified herself as the grandmother of "Shawn Robinson," the name provided on the invoice. At trial, Gudenau testified that he asked Oglesby if she knew anyone who would have used the name Shawn Robinson, used an address similar to hers, and a phone number registered at her address. Gudenau also testified about the information Oglesby provided in response. He stated:

> A. She immediately advised me that Shawn Robinson was a female, and she was very disturbed that someone was using her information, but did not have a lead on a suspect.

> \* \* \*

> Q. All right. So, what, based on that information, what did you do next?

> A. Well, I—I asked if they knew of a Malique Odin since the phone number had been registered to him as well at that address. She stated that Malique was another—another grandchild and lives on Seven Mile, and then I was able to ascertain where Malique was residing.

Gudenau testified that shortly thereafter he visited an address on Seven Mile Road which "belonged to" Odin. He testified that he recognized Odin from his photograph when he answered the door, and he "also recognized he didn't fit the description of the suspect that was given by the victims." He testified that in his view Odin was "shorter, heavier, stocky, very dark-complected."

Gudenau testified that he told Odin why he was there and asked if Odin knew anyone who fit the description that Yalda and Ramoo provided. He also asked if anyone had used his information in the past. Odin could not think of anyone at the time, but he called Gudenau later. At trial, the prosecution elicited testimony from Gudenau about the information Odin provided:

> Q. What was the nature of that phone call?

> A. Malique [Odin] advised me that an individual by the name of Joe Straws was a distant relative that had used the Cherrylawn address in the past, was a cousin to individuals on Cherrylawn, and would know pertinent information about his family and about who Shawn Robinson was. And he further advised me that he fit the description of the suspect in this case.

> Q. Based on that information, what did you do next?

> A. So with that information, I entered Joe Straws' information into our computer database. I was able to generate a photograph of Mr. Straws, and I then put together another photographic lineup which is similar to the one we did with Malique by gathering pictures from our database and importing Mr. Straws' photograph into the lineup. [Emphasis added.]

Neither Odin, nor Oglesby testified at trial. The prosecution introduced their statements solely through Detective Gudenau. Neither was available for cross-examination. The defense did not object to these statements as violative of the Confrontation Clause or the Michigan Rules of Evidence.

Based on the information Gudenau obtained from Odin and Oglesby, he generated a second six-person photo array to present to Yalda and Ramoo. The array included an image of Straws and five other men. A different detective showed the array to Yalda and Ramoo. Yalda testified that she recognized Straws's photo "right away," was certain of her identification, and certain that the person she selected was the same person she identified in court: Straws. Ramoo also testified that he immediately selected Straws's photograph as that of the man who came to the store. When cross-examined about his prior remarks about Odin in the first photo array, Ramoo explained that the officer facilitating the photo array wrote a statement on the selection sheet that Ramoo signed. Ramoo maintained that he did not identify Odin, and only identified the photo of Straws.

At trial, Yalda and Ramoo both testified describing the alleged armed robbery. Both also identified Straws as the robber. Defense counsel objected to Yalda's identification and the trial court allowed a brief voir dire before permitting the in-court identification. When Ramoo testified Straws's counsel acknowledged that his objection would be futile. Both acknowledged that Straws looked different than their initial descriptions, Straws being much heavier, being taller, lacking a scar, and having different facial hair.

Prior to trial, Straws's counsel had filed a motion to suppress identification, which among other things requested a *Wade* hearing.[2] In the motion, Straws argued that the second line-up was biased and suggestive because the victim (Yalda) identified a completely different individual in the first line-up and there was no evidence that the police informed the witnesses that the perpetrator may or may not be present. The prosecution responded, and the trial court set a date for the *Wade* hearing. The day of the hearing, however, Straws's counsel informed the trial court that he was withdrawing the motion. Counsel informed the trial court that he had had an opportunity to view a video of "at least one of the show-ups, which answered a number of questions and objections that [he] would have raised."[3]

As stated, in addition to Yalda and Ramoo, Detective Sergeant Gudenau testified. He explained how his investigation eventually led to Straws's inclusion in the second photographic lineup, the related identification, and arrest. Despite not participating in the "double blind" photo lineups, Gudenau testified about both the first and second photo identifications based on information other officers provided him. Straws's counsel expressly agreed to Gudenau testifying about the line-up procedures, ostensibly so other officers would not have to testify. Gudenau also testified about the statements of Odin and Oglesby. Neither Odin nor Oglesby testified at trial or

---

[2] *United States v Wade*, 388 US 218, 242; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (providing a procedure for evidentiary hearings for motions to suppress pretrial identification of a defendant).

[3] In a letter to the prosecution, he further explained that a hearing was not necessary because "the alleged victim clarified his initial photo ID line-up errors." It is unclear whether this letter was part of the record below.

at the preliminary examination. Straws's trial counsel did not object to Odin and Oglesby's statements, but unlike testimony about the line-up procedures, there was no waiver.

The jury found Straws guilty as charged. Straws filed a motion for a new trial, raising three issues that he also raises on appeal: (1) Gudenau's testimony relaying the statements of Oglesby and Odin violated his Confrontation Clause rights, (2) trial counsel was ineffective for failing to request an instruction on identification, failing to sufficiently challenge the witnesses' identifications, and failing to obtain an expert on the fallibility of eyewitness identification, and (3) his conviction was based on insufficient evidence or against the great weight of the evidence. The trial court denied the motion in a written opinion.

This appeal followed. Following Straws's claim of appeal, Straws moved to remand the case for an evidentiary hearing. This Court denied the motion without prejudice, "for failure to persuade the Court of the necessity of a remand at [that] time." *People v Straws*, unpublished order of the Court of Appeals, entered September 29, 2022 (Docket No. 359205).

## II. CONFRONTATION CLAUSE VIOLATIONS

Straws first argues that Detective Gudenau's testimony violated his rights under the Confrontation Clause. Essentially, he argues he was denied his constitutional right of confrontation when, in response to the prosecutor's questions, Detective Sergeant Robert Gudenau offered testimonial hearsay statements of Oglesby and Odin. We agree and reverse on this basis.

Straws's trial counsel did not object to Gudenau's testimony at trial, so the underlying constitutional claim is subject to plain-error analysis. See *People v Carines*, 460 Mich 750, 762 n 7 & 763; 597 NW2d 130 (1999). See *People v Davis*, 509 Mich 52, 64-65; 983 NW2d 325 (2022).[4] In order to obtain relief under the plain-error rule, a defendant bears the burden of proving that (1) an error occurred, (2) the error was plain, and (3) that the plain error affected substantial rights—in other words, the error affected the outcome of the proceedings. *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022). If a defendant satisfies these three requirements, we must determine whether the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. *Carines*, 460 Mich at 763-764. This last step, sometimes identified as a fourth prong of plain-error analysis, conceptually overlaps with the third prong. *Davis*, 509 Mich at 75-76.

Regarding the first and second prongs of the plain-error analysis, the presentation of Odin and Oglesby's testimonial statements purely through Gudenau without the ability to cross-examine or eyeball the witnesses was an error and it was obvious. This aspect of Gudenau's testimony violated the Confrontation Clause. The Sixth Amendment of the United States Constitution and Article 1, § 20 of the Michigan Constitution guarantee criminal defendants the right to confront the witnesses against them. See US Const, Am VI; Const 1963, art 1, § 20. A primary objective

---

[4] Straws, however, raised this issue in his motion for a new trial, which the trial court denied. We review the trial court's decision denying his motion for a new trial for an abuse of discretion. *People v Abraham*, 256 Mich App 265, 269; 662 NW2d 836 (2003). Because we resolve this issue under the stricter plain-error standard, we need not address abuse of discretion.

of the Confrontation Clause is to compel witnesses to " 'stand face to face with the [factfinder] in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " *People v Buie*, 285 Mich App 401, 408; 775 NW2d 817 (2009), quoting *Mattox v United States*, 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895). The right to confrontation " 'is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' " *Buie*, 285 Mich App at 408, quoting *Barber v Page*, 390 US 719, 721; 88 S Ct 1318; 20 L Ed 2d 255 (1968). The Confrontation Clause has four elements: (1) physical presence, (2) an oath, (3) cross-examination, and (4) "observation of demeanor by the trier of fact . . . ." *Buie*, 285 Mich App at 408 (quotation marks and citations omitted; alteration in original). When combined, these elements ensure "that evidence admitted against an accused is reliable and subject to . . . rigorous adversarial testing . . . ." *Maryland v Craig*, 497 US 836, 846; 110 S Ct 3157; 111 L Ed 2d 666 (1990).[5]

To that end, the Confrontation Clause prohibits the admission of any out-of-court statement that is "testimonial" in nature unless the declarant was available at trial or the defendant had a prior opportunity to cross-examine the declarant. *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "However, the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." *People v Chambers*, 277 Mich App 1, 10-11; 742 NW2d 610 (2007). Rather, "the Confrontation Clause applies only to statements used as substantive evidence." *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011).

At the outset, it is uncontested that the defense did not have an opportunity to cross-examine Oglesby or Odin. Under the Confrontation Clause, this fact renders their statements inadmissible unless they are nontestimonial. See *Fackelman*, 489 Mich at 528-529. We therefore focus our plain-error analysis on the question of whether the statements were testimonial and therefore a violation of the Confrontation Clause.

First, there was an error: Oglesby and Odin's statements to Gudenau were testimonial, so Straws was denied his right to confrontation when the prosecution introduced those statements at trial. Neither the United States Supreme Court nor our Supreme Court has provided a comprehensive or exhaustive list of the sorts of statements that are testimonial and those that are nontestimonial, but the core of these statements is well understood. See *Crawford*, 541 US at 51-52 (providing "core class of 'testimonial statements" that are subject to the Confrontation Clause); *Fackelman*, 489 Mich at 556-558. In the broadest sense, testimonial statements are statements made to be used in court (like prior testimony, expert reports, plea allocutions, and police interrogations) and nontestimonial statements are statements made without such expectation (like casual, off-hand, or overheard remarks, statements in furtherance of a conspiracy, or business records). *Crawford*, 541 US at 51-52. In other words, "testimonial statements 'include statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *People v Spangler*, 285 Mich App

---

[5] Our Supreme Court has interpreted the holding in *Craig* as limited to its specific facts in order to reconcile that case with *Crawford*. See *Jemison*, 505 Mich at 355-357 (reconciling *Crawford* with prior, narrower holding in *Craig*).

136, 154; 774 NW2d 702 (2009), quoting *Crawford*, 541 US at 52. To determine whether a statement constitutes a "testimonial statement," a court must objectively examine the circumstances under which the statement was made. *Davis v Washington*, 547 US 813, 826; 126 S Ct 2266; 165 L Ed 2d 224 (2006).

"Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford*, 541 US at 52. There are of course exceptions. See *Davis*, 547 US at 822-826. For example, a witness's statement responding to police questioning is nontestimonial when the circumstances objectively indicate that the primary purpose of the questioning is for police to respond to an "ongoing emergency." *Davis*, 547 US at 822. "They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. See also *Spangler*, 285 Mich App at 154. Likewise, statements that are not substantive evidence and are not offered for their truth, but offered *only* to show why police took certain investigative steps are not testimonial. See, e.g., *Chambers*, 277 Mich App at 10-11 (holding that there was no Confrontation Clause violation when the lead detective testified that he received a tip that an informant recognized the defendant from media stories containing a surveillance photo because it was not offered for the truth of the informant's tip; "[r]ather, it was offered to establish and explain why the detective organized a surveillance of [the] defendant's home" leading to the defendant's arrest and recovery of other physical evidence); *People v Jackson*, 113 Mich App 620, 624; 318 NW2d 495 (1982) (holding that it was not a Confrontation Clause violation to allow the prosecution to present the content of a police radio dispatch stating that an armed robbery was in progress because it was not offered as proof that the robbery occurred, only to show the reason for the presence of police on the scene).[6]

Here both Oglesby and Odin's statements to Gudenau were testimonial: they provided substantive evidence primarily to prove past events (namely, who is the man who tried to rob the store) potentially relevant for a future trial (namely, the prosecution of Straws). The prosecution offered their statements solely through Gudenau. Though these statements partially informed Gudenau's actions, they primarily served as substantive evidence underpinning the entirety of the prosecution's case. See *Jackson*, 113 Mich App at 624, citing *People v Eady*, 409 Mich 356; 294 NW2d 202 (1980). Oglesby's statements undoubtedly informed Gudenau's next steps in the investigation, but her statements also had independent substantive evidentiary value. First, her statement ruled out a suspect: Shawn Robinson. Oglesby, and Oglesby alone, informed both Gudenau and the jury that "Shawn Robinson," the name appearing on the invoice, was female and could not be the man who robbed the store. She stated that she was concerned that someone was using her granddaughter Shawn's information. Although this narrowed the investigation for Gudenau, it also foreclosed any defense that a *man* named "Shawn Robinson" committed the crime.

---

[6] Although opinions issued before November 1, 1990, are not strictly binding pursuant to MCR 7.215(J)(1), as a published opinion, *Jackson* nevertheless "has precedential effect under the rule of stare decisis" pursuant to MCR 7.215(C)(2). *People v Darga*, ___ Mich App ___, ___ n 6; ___ NW2d ___ (2023) (Docket No. 363178); slip op at 8-9 n 6.

Odin's statements went even further. Like Oglesby, Odin also ruled out a suspect: himself. Odin's statement informed both Gudenau and the jury that Straws (1) knew of the Cherrylawn address (similar to that found on the receipt), (2) had used the Cherrylawn address in the past, (3) was related to individuals that lived on Cherrylawn, and (4) would know information about Odin's family and about who "Shawn Robinson" is. Odin also stated that Straws matched the description of the person the police were looking for—effectively offering a third identification of Straws as a culprit despite not being present during the attempted robbery or available for cross-examination.

The prosecution's argument that the statements are nontestimonial because they were not offered for the truth of the matters asserted is not persuasive for two reasons. First, the cases on which the prosecution primarily relies, *Chambers* and *Jackson*, provide a much narrower exception to the general rule that witness statements to police questions are testimonial. See *Crawford*, 541 US at 51-52. In *Chambers*, this Court held that the Confrontation Clause was not violated when the lead detective testified about an informant's tip that helped police locate the defendant and seize other evidence. See *Chambers*, 277 Mich App at 10-11. There, following a robbery at an ATM, the police obtained still photographs from the ATM's video surveillance, which local television stations publicized. *Id*. at 4. At trial, the lead detective "testified that he received a telephone call from an FBI agent who told him that one of the agent's informants recognized the man in the still photograph as [the] defendant." *Id*. at 10. This Court rejected the defendant's argument that the testimony violated the Confrontation Clause, noting that "the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 10-11, citing *People v McPherson*, 263 Mich App 124, 133; 687 NW2d 370 (2004); *Crawford*, 540 US at 59 n 9. We concluded that the tip was not offered for its truth, but rather, to explain why the detectives organized surveillance at the defendant's home, how they arrested him, and how the police seized other physical evidence. See *Chambers*, 277 Mich App at 11.

The *Chambers* decision relied on *People v Jackson*, which held, that in the context of a robbery trial, testimony about a 911 dispatcher's statement did not violate the right to confrontation because it was not offered to prove the truth of the dispatcher's statement, but merely to explain the presence of officers at the scene. See *Jackson*, 113 Mich App at 624. See also *Chambers*, 277 Mich App at 10-11.[7] This Court explained that it had "no doubt that the jury understood that the dispatcher's statement had no substantive bearing on whether it was in fact a robbery that was taking place." *Jackson*, 113 Mich App at 624. In reaching this conclusion, it distinguished the circumstances in that case from cases where the statement is also substantive evidence probative of issues in the case. See *id*. (distinguishing *Eady*, 409 Mich at 356, where the content of the radio dispatch was substantive proof that the victim had been resisting the defendant's sexual advances prior to the arrival of police at the scene of the alleged criminal sexual conduct).

The prosecution argues that *Chambers* and *Jackson* create an exception to the Confrontation Clause. Besides reading both cases too broadly, it is difficult to imagine how this exception would not collapse the right of confrontation as it relates to statements made in response

---

[7] We observe that *Chambers* generalized the holding in *Jackson* as "[A] statement offered to show why police officers acted as they did is not hearsay." *Chambers*, 277 Mich App at 11.

to police questioning. In reality, neither *Chambers* nor *Jackson* abrogates the hallmark rule: statements in response to police questioning are testimonial and subject to the Confrontation Clause, see *Crawford*, 541 US at 51-52, unless they are *solely* offered to show why the police did something or are subject to confrontation, see *Jackson*, 113 Mich App at 624; *Eady*, 409 Mich at 356. If the statement shows the effect on the hearer *and* has independent evidentiary value its introduction violates the Confrontation Clause. See *Jackson*, 113 Mich App at 624. Thus, the exception is not as expansive as the prosecution argues.

Second, even if we accept the prosecution's broader reading of *Chambers* and *Jackson*, Gudenau's testimony about Oglesby and Odin's statements went well beyond what would be necessary for the prosecution to establish how the police ultimately settled on Straws as a suspect. This was not a tip from an informant that caused an officer to set up surveillance that yielded separate evidence of a crime. See *Chambers*, 277 Mich App at 10-11. This was not a radio dispatch directing Gudenau to an ongoing emergency. See *Jackson*, 113 Mich App at 624. Oglesby and Odin's statements provided the jury with substantive evidence, not just the impact on Gudenau. Instead of eliciting Oglesby and Odin's statements, which rule out two potential suspects, identify Straws as matching the description of the culprit, and assign Straws knowledge of the information on the store receipt, and habit of using that information in the past, the prosecution could have merely asked if Gudenau eventually identified Straws as a suspect and what he did next. This would lead into the photo array and identifications of Straws but without the unconfronted substantive evidence contained in Oglesby and Odin's statements. Thus, these statements were testimonial. Their introduction was a violation of the Confrontation Clause.

Having determined that an error (a Confrontation Clause violation) occurred, we also conclude that the error was obvious, thus satisfying the second prong of plain-error. See *Fackelman*, 489 Mich at 530-533, 537-538. These violations of the Confrontation Clause were obvious. Oglesby and Odin's statements have obvious evidentiary value beyond showing why Gudenau targeted Straws. Their statements rule out suspects, impart knowledge to Straws about information on the invoice, and even describe him as matching the descriptions provided by Ramoo and Yalda. The violations related to Odin are particularly apparent. Essentially, Gudenau testified to the statements of a suspect, wherein the suspect ruled himself out and pointed the finger at Straws. This error is obvious.

We also conclude that Straws has satisfied the third prong of plain error, outcome-determinative prejudice. *Davis*, 509 Mich at 72. The central issue at Straws's trial was identity. Was Straws the man who interacted with Ramoo and Yalda in the store? Or was it Malique Odin? Or was it some other individual named Shawn Robinson, whose name is on the store's invoice? Without the unconfronted testimonial statements of Oglesby and Odin, the jury would have more questions to consider when assessing whether the prosecution had proved Straws's guilt beyond a reasonable doubt. Without Oglesby's statement, the jury would wonder who is "Shawn Robinson," and how is the name connected to Straws? They also would not know if Shawn Robinson was male or female. Without Odin's statements, the jury would have one less person saying Straws matched the description of the culprit. And the jury would not have Odin's unconfronted, self-serving statement ruling himself out as a suspect and assigning Straws knowledge of all of the information contained on the store's invoice. Put plainly, a reasonable juror could find reasonable doubt in the body of evidence that exists without these statements.

The fourth and final consideration of plain-error analysis is, after finding a plain error, determining whether the error warrants reversal. *Fackelman*, 489 Mich at 542. Reversal is only warranted when plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. *Id*. This fourth consideration overlaps with the third factor. See *Davis*, 509 Mich at 75-76. We conclude that these errors seriously diminish the integrity of Straws's conviction. Critical pieces of evidence remain untested through the crucible of cross-examination and the jury's assessment of the witnesses' credibility. See *Fackelman*, 489 Mich at 542. See also *id*. at 526-527.

For these reasons, we find that the Confrontation Clause violations were plain errors warranting vacating Straws's conviction and remanding for new trial.[8] It was an abuse of discretion for the trial court not to grant the motion for new trial on this basis.

## III. CONCLUSION

For the reasons stated above, we conclude that a Confrontation Clause violation occurred when the prosecution introduced Oglesby and Odin's statements through Gudenau. This was plain error warranting reversal. We therefore vacate Straws's conviction and remand for a new trial.

Because we resolve the case on these terms it is unnecessary for us to address the remaining issues Straws raises on appeal. Straws and his new trial counsel will have an opportunity to address many if not all of these issues prior to and during his new trial. One of Straws's claims relates to his counsel's withdrawal of a motion to suppress identification and of a motion for a *Wade* hearing. In a case that largely centers on identification, we struggle to discern any valid strategy in abandoning such a motion and declining a *Wade* hearing, the benefits of which we have long recognized. See *People v Baker*, 103 Mich App 255, 258; 303 NW2d 14 (1981). If counsel again chooses not to pursue such a hearing, we strongly encourage the trial court to make a record of the reason.

We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Douglas B. Shapiro
/s/ Christopher P. Yates

---

[8] Related to his Confrontation Clause issue, Straws also argues that defense counsel was ineffective for failing to object to Gudenau's testimony introducing the statements of Oglesby and Odin. Because of the conceptual overlap between this aspect of his ineffective-assistance-of-counsel claim and the underlying Confrontation Clause claim, we decline to address the ineffectiveness claim.

-10-